**Donald Nephi WATSON, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 4–86–00637–CR.**

Court of Appeals of Texas, San Antonio.

June 15, 1988.

**218**

J.A. Canales, Canales & Associates, Corpus Christi, for appellant.

Rolando Ramirez, Dist. Atty., Alice, for appellee.

Before BUTTS, CANTU and CHAPA, JJ.

## OPINION

BUTTS, Justice.

Appellant was found guilty by a jury of aggravated possession of a controlled substance: cocaine. TEX.REV.CIV.STAT. ANN. art. 4476–15, § 4.04(a), (c), (d)(2) (Vernon Supp.1988). The court assessed punishment at 45 years' imprisonment.

After a jury trial of three co-defendants, appellant, Arnoldo Perez, Sr., and Charles Franklin Keaton, one of them (Keaton) was granted his motion for instructed verdict. Four points of error are urged, the first challenging the sufficiency of the evidence to prove *possession* in order to support the conviction. Because of our disposition of this issue, it is unnecessary to discuss the other points on appeal.

 In reviewing sufficiency of the evidence, this Court must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Dickey v. State,* 693 S.W.2d 386, 387 (Tex.Crim. App.1984). The standard of review is the same in both direct and circumstantial evidence cases. *Dickey v. State,* at 387; *Carlsen v. State,* 654 S.W.2d 444, 449 (Tex. Crim.App.1983). A conviction based on circumstantial evidence cannot be sustained if the circumstances do not exclude every other reasonable hypothesis except that of guilt of the defendant. *Humason v. State,* 728 S.W.2d 363, 366 (Tex.Crim.App.1987); *Carlsen v. State, supra* at 449–50. Proof which amounts only to a strong suspicion or mere probability of guilt is insufficient to support a conviction. *Humason v. State,* at 366; *Moore v. State,* 640 S.W.2d 300, 302 (Tex.Crim.App.1982).

On the morning of February 25, 1986, Trooper Joe Lozano, assigned to the criminal law enforcement and narcotics division of the Texas Department of Public Safety, began a surveillance of Four Seasons Produce Company in Mission, as the result of an informant's telephone call. Four Seasons is an area wholesale distributor of onions. Lozano had received telephone information that a certain tractor-trailer would load up with onions there. Lozano, along with another trooper, waited at the produce warehouse and saw appellant, the driver, back the rig up to the dock to be loaded. He checked the license number and registration and found it was appellant's. Lozano said, "A crew was loading onions when I drove by."

Henry Alvarez was the loading supervisor. He stated he arrived after the loading began. The load was 500 sacks (about 50 pounds each) and was stacked in four layers to the back of the trailer. He said it was his job to see that trailers are properly loaded and orders filled according to the written orders. A full load is 800 to 900 sacks, but he stated it was not unusual for an order to call for a partial load of onions. More produce was sometimes added later. Watson testified that he stayed one day after the loading because Keaton, the purchaser, was trying to buy more onions. Alvarez advised it takes about 45 minutes,

using a forklift and two helpers, to load 500 sacks of onions. He said that not using a forklift, but just "two guys" alone to load 500 sacks of onions would take over an hour ... "that's hard labor." He also said that if, later, just a few sacks were removed, and something put there and covered with the sacks, that would not take as long.

Lozano testified he spoke to Alvarez by telephone and was told the trailer was empty before it was loaded with onions at Four Seasons Produce Company. Alvarez denied speaking to the trooper and said the loading started before he arrived. The troopers did not testify, nor did Alvarez, that Watson assisted in loading the onions.

After his trailer was loaded, Watson drove to Shorty's Truck Stop in Pharr and the tractor was serviced. From there he was followed to Butch's Welding Shop north of Edinburgh, where his trailer was disengaged. A vent window was put on the rear door. Lozano saw this, but admitted he could not see another vent window placed at the front. Everyone agreed vents prevented rot in onions. He was stationed in a position which did not permit that view of the trailer and admitted he could not see everything going on. Appellant had already driven away in his tractor, leaving the trailer with the load at the shop. He went to a truck stop, returning in an hour and one-half.

There were eight officers assisting in the surveillance, at different times. Lozano admitted he did not see appellant load or unload anything in the trailer either on the 25th or 26th of February. No other officer testified that he saw appellant inside the trailer or that he saw appellant load or unload anything. The evidence shows that the tractor had no rear window behind the driver and no opening into the aluminum trailer which permitted the driver to look inside.

It was established that the RST Distributing Company had its offices at a large motel complex, the Echo Motel, in Edinburgh. It and other produce brokerage firms were located in the offices of the motel complex. If a person wanted to obtain onions, he could go to RST Distributing and order onions. The broker would direct him to a particular produce warehouse, such as Four Seasons, to pick up the order. It was established that co-defendant Keaton wanted to buy the onions, that co-defendant Perez was a produce broker working for RST Distributing, and he brokered the purchase, and that appellant was to pick up the onions and take them to Houston. Appellant testified he had earlier carried a load of tile from Mexico. He then came back to the Valley to see whether he could pick up a load to deliver. He said he had been in the area over a week looking for a load when he was hired by Keaton. Keaton was to meet him in Houston at the produce market to dispose of the onions. Appellant had a room at the Echo Motel.

There was testimony that appellant left Butch's with the rig and went to his room at the Echo Motel around 3:00 p.m. About 6:30 p.m. he was followed by another officer to McDonald's hamburger place, where he ordered some food and returned to the motel and his room about 7:00 p.m. He parked the tractor-trailer at the motel. There was no more activity reported until the following morning.

Victor Escalon, a DPS investigator in the narcotics division, testified he was with Lozano at the office when Lozano received the telephone call. He went with Lozano to the Four Seasons Produce Company. He left surveillance that afternoon but resumed it at the Echo Motel that evening and stayed there until the next morning. Other than the trip to McDonald's, there was no activity to report that night. Appellant went to McDonald's the next morning and ate, returning to the motel.

Escalon saw a black Ford pickup, driven by Arnoldo Perez, Sr., arrive at the motel about 9:30 a.m. He followed Perez into the coffee shop. There he watched Perez and appellant for about 15 minutes as they had coffee. Perez was paged for a telephone call, talked on the phone a few minutes, and left. The officer followed him to a nearby H.E.B. supermarket, where he shopped and then drove to his residence.

Because nothing suspicious occurred there during two or three hours, the officer went back to the motel.

Just before dark that evening appellant, driving the tractor-trailer, left the motel. The officer followed and saw the black pickup driven by Perez join the traffic behind the truck. He said another man was in the pickup. They stopped at a convenience store. The truck left; then the pickup left but it stopped at a rest area nearby. The truck was not in sight. Then the pickup began making u-turns, going up and down the highway. In a few minutes the officer saw the pickup heading east again, this time with the truck behind.

Officer Escalon further stated he followed the vehicles, and they went into a "sparsely populated" area that was isolated. It was dark, and the vehicles had their lights on. The pickup followed by the truck made a left turn about two or three miles later. They went on a dirt road. The clearance lamps on the top of the trailer went off then, but not the headlights. He could not say whether the pickup lights were on. Escalon travelled on past the intersection and did not see anything for several minutes. Later he heard by radio the pickup was travelling his way, and it did pass by. This was about five minutes after the vehicles had "gone into that location." He had parked his unit about a fourth of a mile away and did not follow on the dirt road. He saw no activity within that area.

Officer Enrique Espinoza began surveillance of the trailer about 9:00 a.m. on the 26th. He saw Keaton "come and go" at the motel but did not see him meet with either appellant or Perez. Espinoza drove his car following the tractor-trailer after it left the motel that evening. He testified that he also did not follow the two vehicles onto the dirt road but went on a parallel road. He could see the lights were off on the trailer. He said the lights were off on the pickup. He saw other vehicles "coming and going" and leaving the area. He mentioned in particular another pickup, but did not see it stop. None of the other vehicles coming into the area were followed. He

said the black pickup was going "back and forth" in the general area. He did not follow either the tractor-trailer or the black pickup away from the area.

Another officer, Richard Bigham, testified that he observed the tractor-trailer and the pickup at the convenience store. He said there were three people in the pickup. He followed the vehicles to the outlying area, but he also discontinued the surveillance because "I did not know how close I was to what was going on." It was not until twenty minutes later that he saw the tractor-trailer pull into an old truck stop. Bigham was unable to see anything from his parked position at a restaurant (The Cattle Baron) where the three, Perez, appellant, and Keaton met shortly after. He moved to about one-half mile away and listened to his radio. He could testify to no further activities.

Espinoza, in another unit, parked across the divided highway 281, about 100 yards from the Cattle Baron. He saw Perez arrive in his pickup, watched him get out and go into the restaurant, returning about five minutes later. The tractor-trailer parked there. After about 30 minutes, Keaton arrived. Appellant, who was there, then opened the trailer. Perez and Keaton climbed in with flashlights; Watson closed the doors. They came out in about five minutes. He said he saw one of the men open the doors before Keaton arrived, but he did not go into the trailer. He said it was Perez. Espinoza, who watched the trailer all day on the 26th, admitted he never saw appellant load or unload anything.

On cross-examination Lozano said that he could not always observe what was happening at Butch's Welding Shop. He knew that one vent window was installed, but he could not see the work on the front. He affirmed there was no rear window on the tractor. And he also affirmed he never saw appellant load or unload anything. Lozano also was unable to observe the trailer on the dirt road. He confirmed he could not see the onions being loaded at Four Seasons, nor who loaded them.

Appellant testified in his own behalf that Perez worked for RST brokerage and that Keaton had hired him and his rig to haul a load of onions to Houston. He waited over an extra day because Keaton was trying to buy more onions. He went to meet Perez at a convenience store because Perez wanted him to go to nearby weigh scales to "weigh the onions and get a hold of Chuck and see about getting paid." He was to go to the weigh station from the store but "got off on the wrong road [and] I got turned around." He said he did not know the north Edinburgh area. He said he kept "looking for a main road." When asked about the trailer clearance lights, he said he did not know they "went out," but said they "might have." He further said that Perez told him to follow to the scales, but appellant "lost sight of him." He said he finally found a main road and a road which went to the scales. Perez was already at the scales, but they were closed. Appellant had stopped at a small truck stop and telephoned "Chuck" because Perez told him to do so. Keaton was to meet them at the Cattle Baron so Perez could get paid for the onions.

The scales were located across from the Cattle Baron. He moved the truck and parked over there; Perez already was there. Appellant said that out in the area where he had been, he stopped "a couple of minutes" to "relieve myself." He said he was the one who opened the trailer door while they waited at the restaurant to let air get to the onions.

When Keaton arrived, Watson opened the trailer again and the other two men went inside with flashlights. Watson closed the doors after them. They stayed a few minutes. After Keaton "checked the load," he told appellant to go on to Houston. They all left.

Several of the officers followed the tractor-trailer to Falfurrias about 65 miles north of Edinburgh. Lozano testified he stopped appellant there and told him he suspected the trailer contained contraband. He asked appellant to sign a consent to search form, which appellant did. The doors were secured by electrical wire tied on them. He and two other officers entered the trailer and searched for fifteen minutes to locate the contraband. They found cocaine in nine bundles under a layer of onions about 15 to 20 feet from the doors. Lozano testified that the onions were stacked "neatly."

Lozano stated he would not have conducted the search at that time without the consent. The officers recovered nine plastic covered duffle bags of cocaine. A chemist estimated the weight of the cocaine to be 600 to 700 pounds, when the coverings were taken off.

■ *Sinor v. State*, 612 S.W.2d 591, 593 (Tex.Crim.App.1981) summarizes the standard of proof required of the State to establish unlawful possession of a controlled substance. The State must prove two elements: (1) that the accused exercised care, control, or management over the contraband, and (2) that the accused knew the matter possessed was contraband. *Sinor*, reaffirms that same holding found in *Dubry v. State*, 582 S.W.2d 841 (Tex.Crim. App.1979); *Wilkes v. State*, 572 S.W.2d 538 (Tex.Crim.App.1978); *Harrison v. State*, 555 S.W.2d 736 (Tex.Crim.App.1977); *Hernandez v. State*, 538 S.W.2d 127 (Tex.Crim. App.1976). The definition of possession as set out in TEX.REV.CIV.STAT.ANN. art. 4476–15, § 1.02(36) (Vernon Supp.1988) is: " 'Possession' means actual care, custody, control or management." This broader statutory definition has been approved in *Humason v. State*, 728 S.W.2d 363, 365 (Tex.Crim.App.1987). It is also plain that possession must be a voluntary act. TEX. PENAL CODE ANN. § 6.01(b) provides:

(b) Possession is a voluntary act if the possessor knowingly obtains or receives the thing possessed or is aware of his control of the thing for a sufficient time to permit him to terminate his control.

*See, Humason v. State, supra,* at 368 (concurring opinion).

■ Possession of the controlled substance need not be exclusive and evidence which shows the accused jointly possessed the controlled substance with another is sufficient. *Oaks v. State*, 642 S.W.2d 174, 176 (Tex.Crim.App.1982) (citations omitted).

In the instant case the State prosecuted the three defendants on the theory of their possession of the contraband jointly, relying upon a jury charge based on TEX. PENAL CODE ANN. § 7.02(a)(2) (Vernon 1974). However, the mere presence of a defendant at the scene of an offense or even knowledge of an offense does not make one a party to joint possession. *Oaks v. State, supra* at 177. Possession means more than being where the action is; it involves the exercise of dominion and control over the thing allegedly possessed. *Id.*

The *mens rea* requirement of a possessory offense is knowledge by a defendant that his conduct or the circumstances surrounding his conduct constitutes possession of a controlled substance. *See, Humason v. State, supra* at 365; TEX.PENAL CODE ANN. § 6.03(b).

It was stated in *Dubry v. State, supra* at 843:

> Whether the theory of prosecution is sole or joint possession, the evidence must affirmatively link the accused to the contraband in such a manner and to such an extent that a reasonable inference may arise that the accused knew of the contraband's existence and that he exercised control over it. (citations omitted) This affirmative link is established by showing additional facts and circumstances which indicate the accused's knowledge and control of the contraband. (citations omitted)

Among additional facts which can establish the affirmative link are: the contraband was in open and plain view. *Hughes v. State*, 612 S.W.2d 581, 582–83 (Tex.Crim. App.1981); the place where the contraband was found was enclosed, *Mendoza v. State*, 583 S.W.2d 396 (Tex.Crim.App.1979); the accused was the owner of the place where the contraband was found, *Moulden v. State*, 576 S.W.2d 817, 820 (Tex.Crim.App. 1978); the contraband was conveniently assessible to the accused, *Hahn v. State*, 502 S.W.2d 724, 725 (Tex.Crim.App.1973); the accused was the driver of the automobile in which the contraband was found, *Aldridge v. State*, 482 S.W.2d 171, 174 (Tex.Crim.

App.1972); and the contraband was found in the same side of the car seat as where the accused was sitting, *Orosco v. State*, 164 Tex.Cr.R. 257, 298 S.W.2d 134, 136 (1957). *See*, dissenting opinion, *Humason v. State, supra* at 371. *Alaniz v. State*, 458 S.W.2d 813 (Tex.Crim.App.1970) provides this illustration: the accused's action toward the contraband may show his intent to violate the statute.

The State argues there are facts which constitute affirmative links in the present case: (1) appellant owned the vehicle; (2) he was driving and was the sole occupant; and (3) there was a large quantity of an expensive controlled substance in the vehicle. The State contends these facts coupled with the activities of appellant (driving the tractor-trailer into a remote area ... meeting Perez and Keaton at the restaurant ... opening the trailer door for them and closing it behind them ... driving his rig north when the meeting ended ...) provide the additional independent facts and circumstances linking appellant to the contraband in such a manner that it can be concluded he had knowledge of the contraband as well as control over it.

While it is correct that appellant owned the trailer where the cocaine was found, and under the facts of this case, the trier of fact might surmise that appellant knowingly exercised actual care, custody, control or management over the contraband hidden in the trailer, it would not be a rational finding unless it excluded the reasonable hypothesis that appellant was entirely unaware of the presence of the cocaine. Without some evidence excluding the reasonable hypothesis that appellant was unaware of the presence of the cocaine, the trier of fact could not conclude *beyond a reasonable doubt* that appellant knowingly possessed the cocaine.

It is true that appellant was the sole occupant of the tractor, but the evidence established that appellant was not the only one who had access to the *trailer* where the cocaine was concealed. Moreover, his driving the rig was consistent with his usual work, hauling loads of produce or other goods. Having coffee with the bro-

ker of the produce at the motel where appellant was staying and which housed the offices of the broker's employer is not, of itself, indicative of criminal activities or knowledge of criminal activities. The same may be said of the meeting between Perez, the broker, Keaton, the buyer, and appellant, the truck driver, at the restaurant before appellant drove north. Driving north was the route appellant would take to Houston.

The meeting at a convenience store does not signify that beyond a reasonable doubt appellant and Perez were engaged in criminal activities at that time. It may have been suspicious to the officers when the truck and pickup went into a remote area, where they remained for five minutes. No one saw any criminal activities there, however. With Perez remaining in his pickup, "going back and forth," and with appellant saying he got lost out there, could it be established beyond a reasonable doubt that somehow the contraband appeared on the scene and somehow bundles weighing about 800 pounds were neatly placed under a layer of onions 15 to 20 feet from the back of the trailer? Can the trier of fact infer that Perez was the "lookout" and appellant by himself located the contraband and loaded it in less than five minutes without any lights to aid him.

The evidence is plain that appellant was not the only person with access to the trailer where the contraband was located. Can it be inferred that his solitary presence in the tractor was sufficient to prove he knowingly possessed the controlled substance? We hold that a rational trier of fact could not find that such an inference proves appellant's knowing possession beyond a reasonable doubt. Other than his status as owner of the rig and driver of the load of onions, it was not shown that appellant entered the trailer once it was loaded with onions. He was clearly aware of the onions, but we cannot find that a rational trier of fact could infer his awareness or knowledge of the contraband found beneath the onions at the back of the trailer.

The large quantity of the expensive controlled substance found in the trailer only excludes the hypothesis that appellant was unaware of the hidden contraband in the trailer if the trier of fact also had some proof suggesting that appellant was aware of that particular controlled substance. *See, Humason v. State, supra* at 367, citing situations where the defendant was under the influence of a controlled substance or there was the presence of the strong smell of marihuana as the affirmative link. Mere presence in the vicinity of an expensive drug will not suffice to establish that a defendant *knowingly* possessed the controlled substance. *Id.*

While the evidence in the present case may cast some suspicion on appellant, the evidence of affirmative links between him and the cocaine, even considered in combination with the activities in the remote area, at the convenience store, and the meeting at the Cattle Baron restaurant, failed to eliminate the reasonable hypothesis that appellant was entirely unaware of the presence of cocaine. If the evidence supports an inference other than guilt, a finding of guilt beyond a reasonable doubt is not a rational finding. *Denby v. State,* 654 S.W.2d 457, 464 (Tex.Crim.App.1983). Accordingly, we find that no rational trier of fact could have found the appellant guilty beyond a reasonable doubt of intentionally or knowingly possessing a controlled substance. The first point of error is sustained.

Because this Court finds the evidence is insufficient to sustain the conviction, the judgment is reversed and the cause is remanded to the trial court with instructions to enter a judgment of acquittal. *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978); *Greene v. Massey,* 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978).