**Jose Luis RAMOS, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 13–88–144–CR.**

Court of Appeals of Texas,
Corpus Christi.

March 9, 1989.

Rehearing Denied April 6, 1989.

Mark Alexander, Joseph A. Connors, III, McAllen, for appellant.

---

Rene Guerra, Theodore C. Hake, Dist. Atty.'s Office, Edinburg, for appellee.

Before UTTER, BENAVIDES and DORSEY, JJ.

## OPINION

UTTER, Justice.

A jury found appellant guilty of possession of a usable amount of marihuana in an amount of more than 200 pounds but less than 2,000 pounds, and assessed punishment at fifty years' confinement and a $20,000.00 fine. We affirm the judgment of the trial court.

By his first two points of error, appellant challenges the sufficiency of the evidence. Specifically, appellant asserts that the State failed to prove beyond a reasonable doubt that appellant "did intentionally or knowingly possess a usable quantity of marihuana in an amount of more than two hundred (200) pounds but less than two thousand (2000) pounds, ... as charged in the indictment."

■ In reviewing the sufficiency of the evidence, an appellate court looks at all the evidence in the light most favorable to the verdict or judgment and determines whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Dickey v. State*, 693 S.W.2d 386, 387 (Tex.Crim.App. 1984); *Houston v. State*, 663 S.W.2d 455, 456 (Tex.Crim.App.1984). In circumstantial evidence cases, it is not necessary that every fact point directly and independently to the defendant's guilt; rather, it is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances. *Russell v. State*, 665 S.W.2d 771, 776 (Tex.Crim. App.1983), *cert. denied*, 465 U.S. 1073, 104 S.Ct. 1428, 79 L.Ed.2d 752 (1984); *Kimes v. State*, 740 S.W.2d 903, 904 (Tex.App.—Corpus Christi 1987, pet. ref'd.). In *Russell*, the Court of Criminal Appeals wrote:

> The rules of circumstantial evidence do not require that the circumstances should, to a moral certainty, actually exclude every hypothesis that the act may have been committed by another person, but that the hypothesis intended is a reasonable one consistent with the circumstances and facts proved, and the supposition that the act may have been committed by another person must not be out of harmony with the evidence.

*Russell*, 665 S.W.2d at 776; *Kimes*, 740 S.W.2d at 904.

■ To support a conviction for possession of marihuana the evidence must affirmatively link the accused to the contraband in such a manner, and to such an extent, that a reasonable inference may arise that the accused knew of the contraband's existence and of its whereabouts. *Marsh v. State*, 684 S.W.2d 676, 679 (Tex. Crim.App.1984); *Christopher v. State*, 639 S.W.2d 932, 935 (Tex.Crim.App.1982). Specifically, the State must prove two elements: (1) that the accused exercised care, control and management over the contraband; and (2) that the accused knew the matter possessed was contraband. *Humason v. State*, 728 S.W.2d 363, 364 (Tex. Crim.App.1987); *McGoldrick v. State*, 682 S.W.2d 573, 578 (Tex.Crim.App.1985). When an accused is not in exclusive possession of the place where the contraband is found, it cannot be concluded that the accused had knowledge of or control over the contraband unless there are additional independent facts and circumstances which affirmatively link the accused to the contraband. *Cude v. State*, 716 S.W.2d 46, 47 (Tex.Crim.App.1986); *Dickey v. State*, 693 S.W.2d 386, 389 (Tex.Crim.App.1984).

The record reflects that, based on a confidential informant's tip, various narcotics agents drove out to the London Produce Company around 4:00 p.m. on Friday, April 24, 1987, and began surveillance of the truck-tractor and semi-trailer (hereinafter called tractor-trailer) involved in this case. Specifically, they suspected that the tractor-trailer was carrying a concealed, unknown amount of marihuana allegedly loaded with the pineapples and serrano peppers. The officers observed appellant drive the tractor-trailer and back it up to the loading dock, but stated appellant remained in the cab of the tractor-trailer

while it was being loaded. Appellant left by car around 6:20 p.m. and surveillance was terminated around 8:00 p.m.

The officers resumed surveillance at the London Produce Company around 11:30 a.m. on Saturday, April 25, 1987. Around 2:00—3:40 p.m., appellant drove the tractor-trailer to the Sunrise R.V. Park, fueled a "gas tank" on the trailer portion of the tractor-trailer, drove the tractor-trailer to Russell's garage, a place where automotive work is done, and parked it in the lot. Around 5:30 p.m., the officers observed that some white, empty-looking boxes were being removed from the trailer by some unidentified persons and thrown out behind the trailer. However, the officers could not see what, if anything, was contained inside the discarded white boxes. Surveillance was terminated around 8:00—8:30 p.m., a short time after the gate to the entrance was locked.

The officers continued watching the tractor-trailer at Russell's garage around 7:00 a.m. on Sunday, April 26, 1987. Appellant arrived around 9:30 a.m., drove the tractor-trailer to a residence on Jordan Street around 10:37 a.m., and parked it where it would remain until that evening. Appellant returned in a pickup truck around 9:00 p.m. This truck was described as sitting very low to the ground, like it had a very heavy load. There was also a tarp covering something sticking six to ten inches over the top of the truck bed. Appellant then got out of the truck, got into the tractor-trailer, and drove away with the other truck following. The vehicles took a circuitous route and eventually drove down a caliche road, pulled off behind a utility business, and turned out their lights. The location was described as being abandoned, "pitch dark," and with no noteworthy landmark nearby. Moreover, there was no gas station or business located out there that was open at that time. When the vehicles departed around 9:20 p.m., appellant was still driving the tractor-trailer. The vehicles thereafter split up on Highway 281. However, the other truck was no longer loaded, the tarp was gone, and it was sitting "like there was no load to it." One officer followed this other truck back to Edinburg and verified that the truck's bed was now empty. None of the officers, however, ever saw what was contained under the tarp.

Appellant made a brief stop at a truck stop and then drove the tractor-trailer to the Echo Motor Hotel. Appellant exited the vehicle and began walking away, but was stopped and arrested. Appellant was asked which vehicle was his to which he responded by pointing at the tractor-trailer and by stating "That's the one." After appellant consented to a search of the tractor-trailer, sixty-five cellophane-wrapped bundles were found inside the trailer, concealed under the pineapples and serrano peppers. These packages weighed approximately 1024 pounds, and the substance was later positively identified as marihuana. The officers testified that appellant was the only person ever seen driving the tractor-trailer and that the truck belonged to Pete Ruiz.

Jesus Tellez, the general sales manager of London Fruit, testified that on April 24–25, 1987, he made a cash sale of pineapples and serrano peppers to Pete Ruiz. The tractor-trailer arrived sometime after lunch on Friday, was loaded with produce, and left on Saturday afternoon. Appellant was the authorized driver of the tractor-trailer, though it was actually owned by Pete Ruiz. Tellez stated that he was present during at least part of the loading, that the trailer was empty when it arrived, and that it was subsequently loaded with pineapples and peppers by Lupe Garza. No marihuana was loaded into the vehicle. Tellez further stated, however, that Pete Ruiz had asked them to leave some room at the tail end of the trailer because tomatoes were also going to be loaded into the trailer.

Lupe Garza, a forklift operator for London Fruit, testified that he loaded Pete Ruiz' tractor-trailer with pineapples and serrano peppers on a Friday—Saturday sometime in April of 1987. He identified a photograph of the above discussed tractor-trailer resembling the one he loaded. Garza further testified that the only things he loaded into the trailer were pineapples

and peppers, and that no marihuana was loaded into the trailer.

On direct-examination, appellant testified that he drove a truck for a living. On April 24, 1987 (Friday), he drove the tractor-trailer to the London Fruit Company to get loaded with the produce Pete Ruiz was going to buy. He had driven this tractor-trailer on several occasions for his uncle, Pete Ruiz. Although he waited for Lupe Garza to load the trailer, he left the tractor-trailer at London Fruit that evening. Appellant returned around noon on April 25, 1987, waited for the trailer to be finished loading, drove the tractor-trailer to a garage for repair of the fuel lines, and left it parked there that night. Appellant did not know what happened to it after that. One of the mechanics drove him home around 5:30 p.m. Appellant stopped at the Sunshine Trailer Park to fill up the Thermo King on the trailer, a substance used to keep the trailer and the produce refrigerated. Appellant further stated he saw some unknown men remove some of the pineapple boxes from the trailer.

On April 25, 1987 (Saturday), appellant received a phone call and was told to pick up the tractor-trailer and park it at Pete Ruiz' residence at 28th Street in McAllen. He drove the vehicle straight there and Javier, one of the owner's sons, drove appellant home.

On April 26, 1987 (Sunday), he returned to the 28th Street address around 9:00–10:00 p.m. and was to fuel up the tractor-trailer and park it at the Echo Motel. He stated he was not going to drive it anywhere because he had not been paid. However, he fueled it up and took it back to the Echo Motel anyway because he had not yet quit. After appellant left the tractor-trailer, he was stopped by an officer and asked which truck was his. He thereafter pointed out the tractor-trailer and consented to a search. He stated that he was unaware that the trailer had marihuana in it and that he would not have driven it had he known. Appellant thereafter stated he had previously been convicted of possession of marihuana.

On cross-examination, appellant testified that Pete Ruiz was his maternal uncle and that Javier was his cousin. He stayed at London Fruit on Saturday from the time he arrived at noon until the rig was loaded, and then drove the tractor-trailer to a garage in the Russell area, a place where his uncle had instructed him to leave the vehicle when he was having trouble with the fuel lines. Appellant admitted that he saw some strangers take some white boxes of pineapples out of the trailer and put them in a pickup, but stated that he did not know whether his uncle had instructed them to do so. Appellant never spoke to the strangers who were removing the pineapples because he did not feel that he was technically in charge of the tractor-trailer and its merchandise at that point. Lastly, appellant admitted that he drove the tractor-trailer to the El Dora area around 9:00 p.m., but stated he was having trouble with the lights because of a short fuse, and that he stopped to try and fix it. Appellant did not notice any pickup following him, and asserted that the pickup did not park next to him, and that it was not dark at that location because Thermo Kings were allegedly fixed there.

Appellant complains that the State's evidence was insufficient because it failed to show that appellant ever went inside the back end of the trailer where the marihuana was found or that anyone ever actually saw "marihuana" being loaded into the trailer. Appellant further argues that there were several periods of time during which no surveillance occurred and that there were numerous other persons around the trailer. Appellant contends that the evidence presented is just as consistent with the hypothesis that he was unaware that marihuana had been loaded into the trailer. *Humason,* 728 S.W.2d at 367; *Watson v. State,* 752 S.W.2d 217, 222–23 (Tex.App.—San Antonio 1988, pet. ref'd); *Baty v. State,* 734 S.W.2d 62, 65 (Tex.App.—Dallas 1987, pet. ref'd).

However, the record does include several affirmative links to the marihuana. First, although appellant did not own the vehicle, he was the sole operator of the tractor-trailer during the period in question, and

was present when the marihuana was found in the trailer. Second, both Tellez and Garza testified that the trailer was only loaded with pineapples and serrano peppers, and that no marihuana had been loaded into the truck. Third, appellant did not stop strangers from removing boxes of pineapples from the tractor-trailer at Russell's even though he did not know whether they had permission to do so. Moreover, he did not even question them regarding why they were taking his uncle's boxes of pineapples out of the trailer. Fourth, appellant drove a partially-loaded tractor-trailer at 9:00 p.m. on Sunday night to an abandoned and dark area followed by a loaded down pickup truck with a tarp concealing its cargo. When the pickup departed, the bed of the truck was empty and the tarp was removed. Appellant was then followed by the officers back to the Echo Motel, arrested, and the marihuana found. Lastly, appellant's previous conviction for possession of marihuana indicates that he is capable of recognizing that substance.

■ Considering the above evidence in the light most favorable to the verdict, we hold that a rational jury could have found appellant guilty of possession of marihuana as alleged in the indictment beyond a reasonable doubt. We overrule appellant's first two points of error.

By his third point of error, appellant contends that the trial court erred in overruling appellant's objection to improper jury argument during the punishment stage of trial. Specifically, appellant complains that the prosecutor made repeated attacks on defense counsel implying that he was misleading the jury and attempting to trick them. The complained of jury argument is contained in the following excerpt from the record:

> MR. RAMOS: So, what does this tell you about this Defendant? He tells you that he is and was involved in a henious (sic) type of crime. The type of crime that's trying to convert this Valley into a congruent, a funnel. The Florida legislature and law enforcement agencies are cracking down on drug dealers and they are trying to

find another route. I'll tell you, what you need to do now in punishing this man and others like him, is trying to stop becoming like Florida. What Florida is doing now it should have done a long time ago. When you catch someone and punish him severely. They don't want the punishment over there they come over here. They get caught, he gets a low, low punishment and you'll be sanctioning another Florida. Where you have drug dealers and drug lords trying to buy off judges, threatening judges, threatening witnesses.

> Now, what about this sympathy aspect that Defense counsel played on you as I indicated to you? That's his only recourse.

> MR. ALEXANDER: Judge, I'm going to object to commenting on what Defense Attorney did in whatever attempt—

> MR. RAMOS: This is jury argument, Your Honor.

> THE COURT: The Court will advise the Jury that this is Jury argument, and you take your recollection of the testimony in reaching your decision.

> MR. ALEXANDER: Is my objection overruled?

> THE COURT: Yes.

■ Although appellant refers to other portions of the record in his brief, appellant did not object to these portions at trial. It is well established that the failure to make a timely objection stating the specific grounds therefor waives error unless the error is so prejudicial that an instruction to disregard will not cure the harm. *Borgen v. State*, 672 S.W.2d 456, 460 (Tex.Crim. App.1984); *Curtis v. State*, 640 S.W.2d 615, 618 (Tex.Crim.App.1982); Tex.R.App. P. 52(a). We have carefully reviewed the record and hold that an instruction to disregard would have cured the harm, if any. Notably, appellant's failure to object anytime during the jury argument at the guilt-innocence phase of the trial and failure to object until the end of the punishment phase of trial clearly indicates that the trial court had no notice of any improper argument.

Further, the jury argument which was objected to and overruled at trial, when read in context with both the State's and defense's jury argument as a whole, reveals no error. The State was merely responding to numerous pleas for sympathy requested by defense counsel during jury argument. *See Bell v. State*, 724 S.W.2d 780, 802–803 (Tex.Crim.App.1986), *cert. denied*, 479 U.S. 1046, 107 S.Ct. 910, 93 L.Ed. 2d 860 (1987); *Brandley v. State*, 691 S.W.2d 699, 712–13 (Tex.Crim.App.1985). Moreover, even if it was improper, the trial court promptly instructed the jury to recollect the testimony in reaching their decision. We overrule appellant's third point of error.

The judgment of the trial court is AFFIRMED.