Jack Marion SMITH, Jr., Appellant,

v.

The STATE of Texas, Appellee.

No. 13–91–590–CR.

Court of Appeals of Texas,
Corpus Christi.

Nov. 17, 1992.

Discretionary Review Refused
March 3, 1993.

Leslie P. Dixon, Corpus Christi, for appellant.

Grant Jones, Dist. Atty., James D. Rosenkild, Asst. Dist. Atty., Corpus Christi, for the State.

Before NYE, C.J., and GILBERTO HINOJOSA and DORSEY, JJ.

## OPINION

GILBERTO HINOJOSA, Justice.

A jury found appellant guilty of murder and assessed his punishment at ninety-nine years in prison. Appellant's sole complaint is that the evidence is insufficient to sustain the conviction. We disagree and affirm.

In reviewing the sufficiency of the evidence, an appellate court views the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 309, 99 S.Ct. 2781, 2784, 61 L.Ed.2d 560 (1979); *Baugh v. State*, 776 S.W.2d 583, 585 (Tex.Crim.App.1989). In a circumstantial evidence case, the evidence is sufficient if it raises no reasonable hypotheses other than the defendant's guilt. *Livingston v. State*, 739 S.W.2d 311, 330 (Tex.Crim.App.1987); *Ramos v. State*, 767 S.W.2d 248, 249 (Tex.App.—Corpus Christi 1989, pet. ref'd).

The indictment alleged, and thus the State was required to prove, that appellant choked Geraldine (Jerry) Jackson with his hands and that this act caused her death. Appellant contends the evidence fails to show that he caused Jackson's death and, if he did, that he choked her with his hands. As both complaints are related, we will address them together.

The State introduced a portion of appellant's confession in which he stated:

I went to Jerry's house next door and knocked on the front door, but no one answered. I remember going around to the side window, I remember looking in-side and seeing a lamp on inside. The next thing I remember I'm inside Jerry's house. Jerry was awake and said, 'What are you doing in here?' She started screaming. I then told her to shut up. I then hit her one time and she was still screaming. I hit her again and she fell down. When she fell down I got scared. She wasn't screaming anymore after she fell down. She started choking and I thought she was dying. She was choking on her blood or something. I started giving her mouth-to-mouth resuscitation. It didn't seem like she was breathing.

I don't remember how I got out of the house.

A friend discovered Jackson's body lying on the floor next to her bed the morning after the incident. Jackson had bruises around her chin and neck area. She had a small cut on her lip. A pillow under her shoulder had a bloody handprint on it. Other evidence showed that a window had been broken to permit entry into Jackson's house. Appellant's fingerprints were found on the window frame. A bloody palmprint similar to appellant's was found on the pillow. Hairs found in Jackson's hand were similar to appellant's hair and unlike Jackson's hair.[1] A tiny piece of glass, wood splinter, and chalky-type material consistent with window caulking were found on appellant's shorts. In addition to appellant's confession and the corroborating physical evidence which placed appellant at the scene of the crime, the State introduced testimony from one witness that earlier on the day of the killing, appellant was yelling, hit the dashboard of a car, and said that he wanted to kill somebody. From appellant's confession, appellant's prior statement, the physical evidence, and the fact that Jackson died during appellant's burglary of her home, the jury could rationally have found that appellant caused Jackson's death. We now turn to the more specific question appellant raises concerning the cause of death.

Nueces County Medical Examiner Dr. Joseph Rupp performed an autopsy on Jack-

---

1. A forensic scientist testified that hair cannot be definitely linked to a person.

son. Rupp testified that Jackson died of asphyxiation. He defined asphyxiation as "lack of air" and said that asphyxiation can occur by a number of methods. Rupp testified that Jackson could have been strangled, suffocated by a pillow, suffocated by inhaling her own vomit due to intoxication, or asphyxiated by overlaying.[2] It was also possible that Jackson suffered a cardiac arrhythmia. Each of these manners of asphyxiation had some support in the physical evidence or was hypothetically possible. For example, a muscle in Jackson's neck was bruised, indicating possible compression of the neck, and the bruises on her chin were not inconsistent with strangulation. A pillow found near the body suggested possible suffocation by pillow. A number of Jackson's ribs were broken, suggesting that overlaying caused the asphyxiation. Vomit was found in Jackson's mouth and respiratory tree, suggesting that she could have inhaled her own vomit, perhaps due to intoxication. Finally, it was possible that Jackson died as the result of a cardiac arrhythmia induced by appellant's entry into her house. Jackson had a bad heart, and Rupp indicated that a traumatic event could have triggered a cardiac arrhythmia. Rupp did not state that any particular one of these methods caused Jackson's asphyxiation.

Other evidence was admitted concerning some of these possible causes. Dr. Rupp testified that Jackson could have vomited in a final gasp and that people who choke on their own vomit usually do so as the result of very heavy drinking. Rupp testified that Jackson's blood alcohol content of .122 was over the legal limit for operating a motor vehicle, but that this was not high when talking about death-type levels. Rupp testified that Jackson did not exhibit many of the common signs of strangulation (petechial hemorrhages, fractured larynx, neck bruises); however, Rupp further testified that the signs do not always appear.

■ We first determine whether the jury could have rejected any of these theories as unreasonable or inconsistent with the facts of the case. A jury is free to reject hypotheses which it believes are unreasonable. *See Garcia v. State*, No. 683–90, slip op. 10–11 (Tex.Crim.App. June 3, 1992) (not yet reported). We note that Dr. Rupp appeared to believe that choking on vomit due to intoxication was unlikely because Jackson was not highly intoxicated. We therefore find that the jury could have dismissed this possibility as unreasonable.

We also find, based on appellant's statement earlier in the day that he wanted to kill someone, evidence that appellant illegally entered Jackson's house, evidence that Jackson had bruises and broken ribs, and evidence that Jackson had hair similar to appellant's in her hand, that the jury could have reasonably rejected appellant's proffered hypothesis that Jackson died from heart failure. A rational juror could have concluded that Jackson resisted appellant's burglary and that the cause of her death was not a cardiac arrhythmia.

We next turn to whether the other means of death testified to by Dr. Rupp support the State's allegation that appellant choked Jackson with his hands. As noted above, there was some evidence showing that Jackson had been strangled, suffocated with a pillow, or asphyxiated by overlaying.

In arguing that the evidence is insufficient, appellant equates "choking with hands" to compressing the neck with hands. We do not believe that this term must be read so narrowly. "Choke" is not defined in the Penal Code, was not defined in the charge, and is a word commonly known to jurors. It is defined in a dictionary as "to obstruct the breathing of, by blocking the windpipe or squeezing the neck; to suffocate; to strangle." *See* Webster's New Twentieth Century Dictionary, 2nd Ed. (1979). Using this common definition, the jury could reasonably have found any of the three above means would have obstructed Jackson's breathing by blocking her windpipe. We therefore find that all three of these methods constituted some form of "choking," and we thus turn

**2.** Rupp did not define "overlaying," but we presume this term means death was caused by getting on top of someone and smothering them.

to whether it was reasonable for the jury to find that the choking involved appellant's hands.

We do not narrowly read the phrase "with hands" to have required the State to prove that Jackson died from appellant's bare hands directly touching her. We find that a juror would have been justified in finding appellant guilty of using his hands to choke Jackson if appellant used a pillow to compress Jackson's neck or to smother her face. Likewise, we find that a juror would have been justified in finding appellant guilty of using his hands to choke Jackson if appellant caused Jackson's death by overlaying, as a juror could reasonably conclude that such act would have involved the use of appellant's hands in some manner. Finally, a juror could have found appellant guilty if appellant compressed Jackson's neck directly with his hands. Thus, a rational juror could have found that appellant "choked Jackson with his hands" regardless of which of these three methods caused death.

Moreover, as the State notes, it was not required to prove that the act alleged in the indictment *alone* caused the death. *See Jones v. State*, 644 S.W.2d 530 (Tex.App.—Corpus Christi 1982, no pet.); *More v. State*, 692 S.W.2d 912 (Tex.App.—Houston [14th Dist.] 1985, pet. ref'd); *Jackson v. State*, 726 S.W.2d 217 (Tex.App.—Dallas 1987, pet. ref'd).

The evidence in this case supports all of the three above means of choking with hands. The State was not required to prove one particular method, and the jury was not required to agree on that method as long as each juror found that appellant used his hands to choke Jackson. *See Schad v. Arizona*, —— U.S. ——, ——, 111 S.Ct. 2491, 2497, 115 L.Ed.2d 555 (1991); *Kitchens v. State*, 823 S.W.2d 256, 258 (Tex.Crim.App.1991). The evidence is sufficient to support the jury's verdict.

The judgment of the trial court is affirmed.