Patty BUTTS, Appellant,

v.

The STATE of Texas, Appellee.

No. 13-91-451-CR.

Court of Appeals of Texas,
Corpus Christi.

June 18, 1992.

Rehearing Overruled July 30, 1992.

Discretionary Review Refused
Nov. 4, 1992.

Bruce C. Green, Walsh & Green, Huntsville, for appellant.

David Barron, Dist. Atty., Anderson, for appellee.

Before GILBERTO HINOJOSA, DORSEY and FEDERICO G. HINOJOSA, Jr., JJ.

## OPINION

GILBERTO HINOJOSA, Justice.

A jury found appellant guilty of injury to a child and assessed her punishment at 10 years in prison, probated, and a fine of $10,000. We affirm.

Appellant asserts, in her first point of error, that the State failed to prove the *corpus delicti* of injury to a child, that is, that the alleged victim was injured by the criminal act of another. In point two, appellant contends that the State failed to prove that she was the person who committed the offense, if indeed one was committed. The points involve discussion of the same evidence, so we will address them together.

To gain a conviction, the State was required to prove that appellant intentionally and knowingly caused serious bodily injury to Joshua Abatie, a child younger than 15 years of age, by striking his head with a hard object unknown to the grand jury or by causing his head to strike a hard object unknown to the grand jury.

At trial, Joshua's parents, two medical witnesses, and various other persons were called by the State to testify. Appellant testified in her own behalf and called two medical witnesses and various other persons. With the exception of whether appellant injured Joshua Abatie, the events which occurred on October 11, 1989 are largely undisputed. Around 7:30 that morning, Kim Abatie dropped off her four-month-old baby, Joshua, at appellant's house and proceeded to work. Appellant had babysat Joshua for about five weeks.

On this day, appellant, her three-year-old daughter, Jodie, and Joshua were the only people in the house. When Kim left appellant's house, Joshua was happy, awake, and appeared fine, taking a bottle. Appellant herself testified that Joshua was fine.

Around 9:45, appellant called Kim at work and told her that she could not make Joshua stop crying. Appellant was crying and upset. She asked Kim whether she should bring Joshua to Kim or whether Kim would come and get him. Kim could hear Joshua crying in the background and agreed to pick him up. However, less than five minutes later, before Kim had time to leave work, appellant telephoned again. Appellant told Kim that Joshua had a knot on his head. Kim told appellant to take him to Humana Hospital. Kim then went to the hospital to wait for appellant and Joshua to arrive.

According to Kim, when Joshua arrived at the hospital, he was unconscious. He was white and drooling and had a knot on the left side of his head. The exact size of the knot was disputed, but descriptions of it ranged from several centimeters to four inches long and two inches high. Appellant was crying hysterically. When Kim asked appellant what had happened, appellant said that nothing had happened.

Joshua was diagnosed with a skull fracture on the left side of his head and a subdural hematoma on the right side of his head. A subdural hematoma was described as bleeding between the brain and skull. The hematoma was causing neurological damage, and Kim was told that if Joshua did not have surgery within a few minutes, he would die. Joshua was operated on soon thereafter at Humana and was later transferred to a Dallas hospital. As a result of the injury, Joshua is legally blind and paralyzed in the left arm and hand. He will suffer severe learning disabilities.

The State offered evidence to show that Joshua's injuries were not accidental and could not have been inflicted by anyone except an adult after 7:30 in the morning. Appellant offered evidence to show that the injuries could have been accidental or that the injuries could have occurred before

7:30 when appellant took custody of Joshua. The jury found appellant intentionally or knowingly caused the injury.

Appellant's challenge to the sufficiency of the evidence is primarily an attack on the credibility of the State's expert witness, forensic pathologist Dr. Linda Norton. In appellant's argument under both points, she contrasts Norton's testimony to that of her own expert witnesses and characterizes Norton's testimony as "somewhat incredulous," "presumptive," and "highly speculative." She then argues that no rational juror could convict on such evidence.

At the outset, we will briefly summarize Dr. Norton's testimony and that of the other medical experts on several key factors which the State relied upon to establish that appellant committed the offense. These factors include 1) the type of injury Joshua suffered, 2) the degree of force necessary to cause such an injury, 3) the time it would take a knot to form, and 4) whether a child would appear normal after sustaining such an injury.

### Type of Injury

Dr. Norton testified that she believed Joshua's injury occurred when his head struck another object. Norton concluded that the injury occurred in this manner because the subdural hematoma was on the side of his head opposite the skull fracture. Norton explained that when a moving head strikes an object, the skull on the side of impact will fracture, and the brain, still in motion, will tear away from the skull on the opposite side of impact, thereby causing bleeding under the skull on that side. Norton testified that a blow to the head would not create the type of injury Joshua sustained. She explained that when a head is struck by an object, the hematoma, if any, occurs on the side of impact.

Dr. David MacDougall, a neurosurgeon, testified as a witness for appellant. He testified that because no one witnessed the trauma to Joshua's head, it was possible that the skull fracture and subdural hematoma were not related. According to him, the skull fracture could have occurred days before the hematoma. MacDougall be-lieved that Joshua's injury could have occurred from something hard striking his head.

Dr. Karl Schmidt, the neurosurgeon who operated on Joshua at Humana Hospital, was called by appellant. He testified that in the vast majority of cases, when a fracture occurs on one side of the head and a hematoma develops on the other, the trauma is related. Schmidt described Joshua's injury as "really very severe" and believed that the injuries were the result of one trauma. In contrast to Norton, however, Schmidt believed that the injury could have occurred by something striking the head.

### Degree of Force

Dr. Norton testified that the force necessary to cause Joshua's injury was equivalent to falling on concrete from a two-story window. Norton testified that Joshua's trauma could not have occurred by rolling off a counter or a dresser. She testified that a child would not be strong enough to cause this type of injury.

Dr. MacDougall testified that Joshua's injuries could have been caused by an automobile accident or falling off a counter. Dr. Schmidt testified that the injury could have occurred in an automobile accident or a fall.

### Time for Formation of Knot

When Joshua arrived at the hospital, he had a lump on his head. Dr. Norton testified that lumps quickly develop after trauma to the head because there is very little room for blood to form between the bone and skin. Dr. MacDougall opined that a knot would not necessarily immediately appear after injury. Dr. Schmidt opined that knots vary in size and the time when they become noticeable. Debra Higginbotham, the emergency room director at Humana Hospital, testified from her experience that a knot would appear quickly after an injury.

### Appearance After Injury

Dr. Norton opined that when a child is severely injured, as in this case, the child is

neurologically injured from the time of the injury and would not "behave normally or function normally in any way, shape, or form." She believed, with an injury of Joshua's severity, that a child would experience a loss of consciousness or a decreasing consciousness from the time of trauma. Norton testified that a semi-comatose child would not take a bottle or cry. In contrast to Norton's testimony, Dr. MacDougall opined that it was possible for an infant who sustained an injury an hour or two before arriving at the babysitter's house to appear normal. Dr. Schmidt believed it "was conceivable" that Joshua could have appeared normal at 7:30, when he was dropped off at appellant's house.

### Expert Conclusions

Dr. Norton concluded that because the child was functioning normally at 7:30 in the morning and would not function normally after the trauma, then the injury occurred after 7:30. She further concluded, based on the severity of the injury and the characteristics of the injury, that Joshua was either picked up and slammed or thrown. She believed that the injury was the result of an intentional act perpetrated by an adult.

Dr. MacDougall believed there was no medical way of knowing when the child was injured; it could have been as early as midnight. MacDougall testified that, even knowing that Joshua appeared normal at 7:30, he could not reasonably say that the injury occurred after 7:30.

Dr. Schmidt believed that the precise cause of the injuries was unclear. Schmidt guessed Joshua's hematoma occurred "probably within six hours" of his coming to the hospital.

### Analysis of the Evidence

In reviewing the sufficiency of the evidence, an appellate court views the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson v. Virginia,* 443 U.S. 307, 309, 99 S.Ct. 2781, 2783–84, 61 L.Ed.2d 560 (1979); *Baugh v. State,* 776 S.W.2d 583, 585 (Tex.Crim.App.1989).

In a circumstantial evidence case, the evidence is sufficient if it raises no reasonable hypotheses other than the defendant's guilt. *Livingston v. State,* 739 S.W.2d 311, 330 (Tex.Crim.App.1987); *Ramos v. State,* 767 S.W.2d 248, 249 (Tex. App.—Corpus Christi 1989, pet. ref'd); *see Geesa v. State,* 820 S.W.2d 154, 156–161 (Tex.Crim.App.1991).

Appellant first contends that the State failed to show that an offense occurred, relying in part on *Johnson v. State,* 673 S.W.2d 190 (Tex.Crim.App.1984). In *Johnson,* a nineteen-month-old child suffered a head wound caused by a blunt surface. The defendant, who was the child's father, claimed that a car had accidentally fallen off a jack stand onto the child. A pathologist testified that the wound was not consistent with a car falling and striking the child. The Court of Criminal Appeals found the evidence insufficient to show that an offense had occurred. The Court stated:

> Dr. Diaz–Esquivel testified the fatal injury was a "blow with a flat surface, ... or a very blunt instrument ... not a curved surface ... sort of a flat surface." The pathologist did not speculate how the blow could or could not have occurred. He did not testify that it had to be by human means. He stated it was not consistent with a car falling on the deceased. No criminal instrument was found at the scene nor suggested by the pathologist. There were no eyewitnesses to the child's injury.

In contrast to the pathologist in *Johnson,* Dr. Norton explained why she believed Joshua's injury occurred as the result of an intentional act perpetrated by an adult during the time that Joshua was in appellant's exclusive care. Norton's conclusion was based on the characteristics of the injury and the degree of force necessary to cause that injury, in combination with her conclusion that an injury as severe as Joshua's would not have gone unnoticed. Norton gave her expert opinion on the time and

cause of injury, explaining to the jury how she arrived at those conclusions. The jury was not asked to speculate on the cause of Joshua's injuries. We do not find *Johnson* applicable to the facts here.

■ Appellant further contends that Norton's testimony was unbelievable and speculative and should be insufficient to support the conviction. As an example, appellant points out that Norton believed a child would become comatose at the time of such a severe injury and would not cry thereafter, but that Dr. Schmidt's testimony, Kim Abatie's testimony, and the hospital records show that Joshua did cry after the injury.

Unlike appellant, we do not believe that Norton's testimony must be discounted merely because Joshua's post-trauma behavior did not conform to Norton's expectations. Further, we note that Norton testified that a child who sustained such an injury would have become unconscious immediately or would experience a decreasing consciousness from the time of trauma. The evidence concerning Joshua's condition at the hospital showed he was slipping into and out of consciousness. This evidence is hardly much different from Norton's testimony that Joshua would immediately have become unconscious or would experience decreasing consciousness from the time of trauma.

■ Moreover, it was the jury's prerogative to find that Norton was mistaken about Joshua's ability to cry but correct in her assessment of the severity of the injury and its cause. A rational juror could have believed Norton's conclusions while also finding that Joshua had cried after being injured.

Appellant also attacks Norton's conclusion that Joshua's injury was caused by his head striking an object. She contrasts it to MacDougall's and Schmidt's testimony that the injury could have been caused by something striking Joshua. Appellant then submits "that the totality of the evidence presented to the jury in this case completely fails to establish beyond a reasonable doubt that the injury to Joshua Abatie was caused by a criminal act."

■ We disagree with appellant's argument. Although Norton's conclusions were disputed by appellant's witnesses, the jury was free to accept Norton's testimony and reject the conclusions of the other witnesses. *Esquivel v. State*, 506 S.W.2d 613, 615 (Tex.Crim.App.1974); *Garcia v. State*, 750 S.W.2d 922, 923 (Tex.App.—Corpus Christi 1988, no pet.). Norton's testimony, if believed, established that Joshua's injury occurred after 7:30. Norton's conclusion was based on her belief that Joshua would have quickly developed a lump on his head and would not have behaved normally after receiving such a severe injury. Appellant's own testimony established that she had exclusive possession of Joshua after 7:30, and Dr. Norton's testimony, if believed, established that Joshua's injuries were so severe that they could only have been inflicted intentionally by an adult after 7:30. On this evidence, a rational juror could have found that an offense was committed and that appellant was the person who committed the offense. *See Plunkett v. State*, 580 S.W.2d 815, 821 (Tex.Crim.App. 1979); *Sandow v. State*, 787 S.W.2d 588, 598–99 (Tex.App.—Austin 1990, pet. ref'd); *Huerta v. State*, 635 S.W.2d 847, 851 (Tex. App.—Corpus Christi 1982, pet. ref'd).

We further point out that Norton's testimony is not the only evidence which incriminates appellant. Debra Higginbotham testified that she believed Joshua's injury was recent because it had not bruised yet. She also testified that Joshua had bruises on his buttocks and his legs that appeared fresh. She believed the bruises were made within the past several hours. The bruises looked like the marks left when the skin is hit. She stated that some of the bruises were consistent with someone grabbing the child's legs and hitting him against a wall.

The State also presented evidence to show that appellant had previously called Kim Abatie when Joshua would cry. About two weeks before this incident, appellant, crying and upset, had called Kim to say that Joshua would not stop crying. The State sought to show by this evidence that Joshua's crying irritated appellant. In

fact, appellant, though she denied committing any offense, testified that Joshua's crying irritated her on some days.

When reviewing all the evidence in the light most favorable to the verdict, we find sufficient evidence from which a rational jury could have found that a criminal act occurred and that appellant committed that act. Appellant's first and second points of error are overruled.

 In point three, appellant contends that the trial court erred by assessing a period of jail time as a condition of probation. The trial judge assessed eighty-four days in jail as a condition of probation. Appellant argues that when the jury recommends probation, the judge cannot impose such a condition. This argument has been considered and rejected. *Simpson v. State*, 772 S.W.2d 276, 278 (Tex.App.—Amarillo 1989, no pet.); *Custard v. State*, 746 S.W.2d 4, 6–8 (Tex.App.—Dallas 1987, pet. ref'd). Even when the jury recommends probation, it is the trial court which "grants" probation. *See* Tex.Code Crim. Proc.Ann. art. 42.12, § 4(a) (Vernon Supp. 1992). Appellant's third point of error is overruled.

The judgment of the trial court is affirmed.