NUMBER 13-02-491-CR

COURT OF APPEALS

THIRTEENTH DISTRICT OF TEXAS

CORPUS CHRISTI - EDINBURG




THE STATE OF TEXAS,                                                               Appellant,

v.

EUGENE X. MERCIER,                                                                  Appellee.




On Appeal from the 332nd District Court
of Hidalgo County, Texas.




O P I N I O N

Before Justices Hinojosa, Yañez and Castillo
       Opinion by Justice Castillo

         The State appeals from an order of the district court granting a motion for new
trial, entering an acquittal, and entering conditional orders pendent on future appeals. 
See Tex. Code Crim. Proc. Ann. art. 44.01(a)(2), (3) (Vernon Supp. 2004-05). The
underlying offense is conspiracy to commit barratry. We reverse the trial court's order
and remand. 
I. BACKGROUND
         The trial court granted appellee Eugene X. Mercier's motion for new trial after
a jury returned a guilty verdict for criminal conspiracy and acquitted him on all other
counts.


 By four issues, appellant, the State of Texas, asserts that the trial court erred
in: (1) entering an order containing conditional post-appeal dispositions; (2) finding the
evidence legally insufficient to sustain the conviction; (3) conditionally dismissing the
indictment; and (4) conditionally granting a new trial.


 By sixteen cross-points,



Mercier asserts, in general, lack of jurisdiction, failure to preserve error, insufficiency
of the evidence to sustain the conviction, Brady violations,


 Kyles violations,



limitations, and federal constitutional violations and deprivation of rights. 
A. Procedural History
         The indictment charged Mercier with four counts of barratry and two counts of
criminal conspiracy. The State obtained the initial conspiracy indictment in this case
on March 21, 2000. Mercier was reindicted on December 19, 2001. Then, on
December 21, 2001, after obtaining the second indictment, the State dismissed the
first indictment against Mercier. The first indictment alleged two counts of conspiracy
to commit barratry under Texas Penal Code section 38.12(a) and (b).


 See Tex. Pen.
Code Ann. § 38.12(a), (b) (Vernon 2003). The second indictment alleged the same
two counts. Mercier pleaded not guilty on all counts. The case proceeded to trial in
the 332nd district court of Hidalgo County. On April 11, 2002, the trial court denied
Mercier's motion to dismiss which was submitted as an application for writ of habeas
corpus based on the statute of limitations. On April 18, 2002, the jury found Mercier
guilty of one count of criminal conspiracy.


 The jury acquitted Mercier on the
remaining counts. On May 6, 2002, Mercier moved to continue sentencing to allow
more time to discover Brady evidence.


 The trial court heard Mercier's motion on May
7, 2002. On May 22, 2002, Mercier moved the court to clarify the prior ruling, and
the trial court complied on May 29, 2002. The trial court entered an order on
Mercier's motion to clarify.


 Mercier filed a second motion to continue sentencing,
asserting he required additional time to acquire, listen to, and transcribe, if necessary,
audiotapes. The trial court denied the motion on the date of sentencing. On June 14,
2002, the trial court sentenced Mercier to two years in a state jail facility and
immediately suspended that sentence for a term of five years' community supervision. 
The trial court assessed a $7,500.00 fine. On June 14, 2002, Mercier filed a notice
of appeal. On the same day, he filed three post-sentencing motions.
B. Mercier's Post-Verdict Motions Filed on June 14, 2002
1. Motion for New Trial–Sufficiency of the Evidence
         As grounds for his motion for new trial, Mercier asserted that the evidence was
legally and factually insufficient to support his conviction. The trial court set the
hearing for July 16, 2002.
2. Motion in Arrest of Judgment–Statute of Limitations
         As grounds for his motion, Mercier asserted the following: (1) under appellate
rule 22.2(a), the indictment is subject to an exception on substantive grounds because
prosecution was barred by a three-year statute of limitations;


 (2) he preserved error
by filing a pre-trial application for writ of habeas corpus which the trial court denied;
and (3) the district court did not have jurisdiction because: (a) the indictment alleged
an offense punishable as a misdemeanor, and (b) the offense alleged was a Class B
misdemeanor. 
3. Motion to Reduce State Jail Felony Punishment to Misdemeanor Punishment
         In this motion, Mercier requested punishment for a Class A misdemeanor "after
the court's considering the gravity and circumstances of the felony committed and the
history, character, and rehabilitative needs of the defendant." 
4. Motion to Set Aside Judgment and For New Sentencing Hearing
         Mercier requested that the trial court order a new sentencing hearing because,
in general, the suspended sentence is too lengthy. 
C. Mercier's Post-Sentencing Motions Filed on July 9, 2002
1. "First" Motion for New Trial



         In this motion, Mercier generally asserted the evidence at trial was insufficient
to sustain his conviction. In particular, Mercier requested a new trial because: (1) he
did not receive a fair trial under the state and federal constitutions; (2) he was denied
due process; (3) the evidence to support the conviction and sentence was legally and
factually insufficient; (4) he was denied due course of law; (5) the verdict was
contrary to the law; (6) the trial court misdirected the jury about the law; (7) the State
and the trial court committed reversible errors at pre-trial and during trial; (8) the State
did not produce Brady material; and (9) the indictment failed to allege a crime
committed within the three-years limitations period and, thus, prosecution was barred
by limitations.



 
2. "First" Motion in Arrest of Judgment
         Mercier again asserted that: (1) prosecution was barred by limitations; and (2)
the trial court lacked jurisdiction over a misdemeanor offense. 
3. First Amended Motion for New Trial Filed on July 15, 2002 
         In this motion, Mercier incorporated his July 9 motion for new trial.


 As
grounds, he asserted: (1) the trial court was required to order an acquittal because the
State's expert witness, Scott Rothenberg, testified as to the substantive barratry
count; (2) the State withheld evidence tending to establish his innocence; and (3) the
State knowingly presented false testimony at trial.
4. Brady Motion Filed on July 29, 2002
         Mercier alleged that the State withheld additional audiotapes. By order dated
July 29, 2002, the trial court granted the motion and ordered post-trial discovery of
the audiotapes. 
 D. The Motion for New Trial Order
         After evidentiary hearings on July 18 and 19, 2002, the trial court
unconditionally granted the motion for new trial expressly on legal insufficiency
grounds.


 The order acquitted Mercier. The order purported to grant a conditional
dismissal of the indictment in the event of a future possible reversal by this Court of
the motion for new trial. Finally, the order sought to grant a conditional new trial in
the event of a second future possible reversal by this Court of the conditional dismissal
of the indictment. The State's appeal ensued. 
II. CONDITIONAL ORDERS GRANTING FUTURE RELIEF 
         In its first issue, the State argues that the portions of the August 22, 2002
order purporting to conditionally dismiss the indictment in the event of a reversal on
appeal and to conditionally grant a new trial in the event of a second reversal on
appeal are void. The State argues that the scope of our review is limited to whether
the evidence was legally sufficient to support the conviction, contained in the non-conditional part of the trial court's order. Mercier responds in his first cross-point that
the State has not invoked our jurisdiction because the notice of appeal is insufficient.
A. Appellate Jurisdiction
         Jurisdiction is fundamental and cannot be ignored. State v. Roberts, 940
S.W.2d 655, 657 (Tex. Crim. App. 1996) (en banc). Our jurisdiction must be legally
invoked. Ex parte Caldwell, 383 S.W.2d 587, 589 (Tex. Crim. App. 1964). If not
legally invoked, our power to act is as absent as if it did not exist. Id. When we lack
jurisdiction to act, we have no power to dispose of the purported appeal in any manner
other than dismissal for lack of jurisdiction. Olivo v. State, 918 S.W.2d 519, 523
(Tex. Crim. App. 1996) (en banc). 
         This appeal is from an appealable order. See Tex. R. App. P. 25.2(a)(1). The
State timely filed a notice of appeal. Tex. Code Crim. Proc. Ann. art. 44.01(d) (Vernon
Supp. 2004-05). A timely-filed notice of appeal vests a court of appeals with
jurisdiction over a case. Lopez v. State, 18 S.W.3d 637, 639 (Tex. Crim. App. 2000);
see Olivo, 918 S.W.2d at 522. Notice of appeal is sufficient if it shows the party's
desire to appeal from the judgment or other appealable order, and, if the State is the
appellant, the notice complies with Code of Criminal Procedure article 44.01. See Tex.
R. App. P. 25.2(c)(2). We have reviewed the notice of appeal and find it is sufficient. 
The State appeals a trial court order granting a new trial. The order also modifies a
judgment. We have jurisdiction. See Tex. Code Crim. Proc. Ann. art. 44.01(a)(2), (3)
(Vernon Supp. 2004-05); see also State v. Gutierrez, 129 S.W.3d 113, 115 (Tex.
Crim. App. 2004). We overrule Mercier's first cross-point.
B. Relevant District Court Jurisdiction
         The trial court granted Mercier's amended motion for new trial. The trial court's
order conditionally dismissed the indictment in the event of a reversal by this Court
and conditionally granted a new trial in the event of a second reversal by this Court. 
The State appeals both conditional orders in its third and fourth issues. The State may
appeal an order that dismisses the indictment. Tex. Code Crim. Proc. Ann. art.
44.01(a)(1) (Vernon Supp. 2004-05). By his fifth and sixth cross points, Mercier
argues that the orders granting a dismissal and a new trial in the event of future
appeals were proper.
          In this State a district judge has jurisdiction over criminal matters conferred by
virtue of the Texas Constitution. Tex. Const. art. V, § 5; State ex rel. Holmes v.
Denson, 671 S.W.2d 896, 898 (Tex. Crim. App. 1984) (en banc) (orig. proceeding)
(citing Garcia v. Dial, 596 S.W.2d 524, 527-28 (Tex. Crim. App. 1980)). The
attachment of jurisdiction in the district court conveys upon that court the power to
determine all essential questions "and to do any and all things with reference thereto
authorized by the Constitution and statutes, or permitted district courts under
established principles of law." Denson, 671 S.W.2d at 898. A court's having
jurisdiction "embraces everything in the case and every question arising which can be
determined in the case, until it reaches its termination and the jurisdiction is thereby
exhausted." Id. 
         The filing of a notice of appeal simply invokes appellate jurisdiction. State v.
Gutierrez, 143 S.W.3d 829, 831 (Tex. App.–Corpus Christi 2004, no pet.) (citing Hall
v. State, 698 S.W.2d 150, 152 (Tex. Crim. App. 1985) (en banc)). The notice of
appeal does not divest the trial court of jurisdiction to hear, consider, and rule on a
timely filed motion for new trial. Id. The filing of the appellate record, not the notice
of appeal, severs the trial court's jurisdiction to adjudicate the case. Tex. R. App. P.
25.2(g); see Green v. State, 906 S.W.2d 937, 939 (Tex. Crim. App. 1995) ("Once the
trial record has been filed with the Court of Appeals or this Court, the trial court no
longer has jurisdiction to adjudicate the case."). Texas Rule of Appellate Procedure
40(b)(2) provides that in the appeal of a criminal case, when the record has been filed
in the appellate court, all further proceedings in the trial court, except as provided by
law or by these rules, shall be suspended and arrested until the mandate of the
appellate court is received by the trial court. Tex. R. App. P. 40(b)(2); see Green, 906
S.W.2d at 939. The trial court cannot regain jurisdiction unless and until the court of
appeals returns the case to that court. Lopez v. State, 18 S.W.3d 637, 639 (Tex.
Crim. App. 2000). It is axiomatic that where there is no jurisdiction, the power of the
court to act is as absent as if it did not exist and any order entered by a court having
no jurisdiction is void. See Green, 906 S.W.2d at 939 (citing Dial, 596 S.W.2d at
528). 
         We apply these principles to the State's first, third, and fourth issues, in the
context of the trial court's plenary jurisdiction during the motion for new trial
proceedings. 
C. Trial Court's Authority to Grant an Amended Motion for New Trial
         In criminal cases, there is no common law right to a new trial. Banks v. State,
186 S.W. 840, 841 (1916). The right is purely statutory. Id.; see Drew v. State, 743
S.W.2d 207, 223 (Tex. Crim. App. 1987) (en banc); see also Tex. R. App. P. 21.2. 
When the State appeals from an order granting a new trial, the proper standard of
appellate review is abuse of discretion. State v. Gonzalez, 855 S.W.2d 692, 696
(Tex. Crim. App. 1993) (en banc). The trial court is granted wide latitude in exercising
the decision to grant or deny a motion for new trial, and in the absence of an abuse
of discretion, an appellate court should not reverse. Lewis v. State, 911 S.W.2d 1,
7 (Tex. Crim. App. 1995). 
         The time for filing motions for new trial and amended motions for new trial in
criminal cases is presently governed by Texas Rule of Appellate Procedure 21.4. See
Tex. R. App. P. 21.4.


 To construe a rule of appellate procedure, we apply the rules
of statutory construction. See State v. Hardy, 963 S.W.2d 516, 519 (Tex. Crim. App.
1997) (en banc). Under ordinary statutory construction, we apply the plain meaning
of the words contained in the rule unless such application would lead to an absurd
result. Id. The rule does not authorize an amendment of a motion after the thirty days
have expired. Accordingly, no amended motion for new trial may be filed after the
thirty-day period, even with leave of court. Id.; see also Drew, 743 S.W.2d at 222-23
(construing former rule).
         In this case, Mercier amended his motion for new trial twice. The trial court
expressly considered the documents filed on June 14, 2002, July 9, and July 15,
2002. The motion for new trial and one or more amended motions were timely filed. 
 See Tex. R. App. P. 21.4. The motions were properly before the trial court. The trial
court was within its statutory authority to grant relief based on the record before it. 
We turn to the State's argument that the trial court had no authority to grant
conditional relief.
D. Future Relief
         Granting a motion for new trial restores the case to its position before the
former trial, including, at any party's option, arraignment or pretrial proceedings
initiated by that party. Tex. R. App. P. 21.9. The prior conviction must not be
regarded as a presumption of guilt, nor may it be alluded to in the presence of the jury
that hears the case on retrial. Id. The granting of a motion for new trial is the
equivalent of an acquittal. Rodriguez v. State, 852 S.W.2d 516, 519 (Tex. Crim. App.
1993) (en banc) (stating trial court no longer had jurisdiction over case after granting
motion for new trial on insufficient evidence ground because granting the motion for
new trial was equivalent of acquittal) (citing Moore v. State, 749 S.W.2d 54, 58 (Tex.
Crim. App. 1988) (en banc), overruled on other grounds Awadelkariem v. State, 974
S.W.2d 721, 728 (Tex. Crim. App. 1998)).
E. Disposition
         In this case, the trial court granted the motion on legal sufficiency grounds and
entered an acquittal. When a trial court grants a motion for new trial based solely on
legal insufficiency of the evidence, the only further action permitted by the Double
Jeopardy Clause is an entry of a judgment of acquittal. See Smith v. State, 15
S.W.3d 294, 301 n.3 (Tex. App.–Dallas 2000, no pet.); see also Gollihar v. State, 46
S.W.3d 243, 247 n.4 (Tex. Crim. App. 2001). Nothing in rule 21.9 addresses the trial
court's authority or lack of authority to grant relief in the event of future appeals. We
conclude that the trial court's orders granting relief as to future appeals are advisory
and of no legal effect. See Tex. R. App. P. 21.9; see Hardy, 963 S.W.2d at 519. We
sustain the State's first issue. 
         In its third and fourth issues, the State challenges the trial court's conditional
orders. We have already concluded that the trial court's conditional orders are
advisory and of no legal effect. Whether the parties will file further appeals remains
hypothetical. Accordingly, we do not express any opinion on the question of the trial
court's orders conditioned on further appeals. We are without authority to render
advisory opinions. Armstrong v. State, 805 S.W.2d 791, 794 (Tex. Crim. App.
1991); Hargrove v. State, 774 S.W.2d 771, 773 (Tex. App.–Corpus Christi 1989,
pet. ref'd). Thus, we do not reach the State's third and fourth issues and Mercier's
fifth and sixth cross-points. See Tex. R. App. P. 47.1
         Because the trial court granted relief expressly on grounds of legal insufficiency,
we turn to the merits of the State's second issue. Tex. Code Crim. Proc. Ann. art.
44.01(2), (3) (Vernon Supp. 2004-05). By his second cross-point, Mercier argues that
the State failed to preserve error by not contesting all implied findings and conclusions
of law supporting the order of acquittal. 
III. LEGAL SUFFICIENCY OF THE EVIDENCE
         By its second issue, the State argues that the evidence was legally sufficient to
sustain the conviction. By his fourth cross-point, Mercier asserts legal insufficiency
of the evidence. Because a legal sufficiency challenge, if sustained, results in an
acquittal rather than a retrial, we must consider the issue. See Clewis v. State, 922
S.W.2d 126, 132 (Tex. Crim. App. 1996) (en banc). 
A. Scope and Standard of Review–Motion for New Trial
         We review the granting of a motion for new trial under an abuse of discretion
standard. See Lewis, 911 S.W.2d at 7. An abuse of discretion occurs when the trial
court's decision was so clearly wrong as to lie outside that zone within which
reasonable persons might disagree. Cantu v. State, 842 S.W.2d. 667, 682 (Tex.
Crim. App. 1992) (en banc). An abuse of discretion occurs when the trial court acts
arbitrarily or unreasonably, without reference to guiding rules or principles. 
Montgomery v. State, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990) (en banc). We
may not substitute our judgment for that of the trial court. Cantu, 842 S.W.2d at
682. Instead, we must decide whether the trial court's decision was arbitrary or
unreasonable. Id.; Gonzalez, 855 S.W.2d at 696. The credibility of the witnesses is
primarily a determination for the trial court. Hoyos v. State, 951 S.W.2d 503, 511
(Tex. App.–Houston [14th Dist.] 1997), aff'd, 982 S.W.2d 419 (Tex. Crim. App.
1998). As finder of fact, the trial judge may accept or reject any part or all of the
testimony given by State or defense witnesses. Johnson v. State, 571 S.W.2d 170,
173 (Tex. Crim. App. [Panel Op.] 1978); see also Guzman v. State, 955 S.W.2d 85,
89 (Tex. Crim. App. 1997) (en banc). Thus, we are authorized to: (1) apply a
deferential standard of review to the trial court's resolution of historical facts; and (2)
may rely upon implied findings of fact that are supported by the record to uphold the
trial court's ruling, even when the trial court is not faced with expressly conflicting
affidavits or testimony. Charles v. State, 146 S.W.3d 204, 206 (Tex. Crim. App.
2004).
         Even so, in ruling on a motion for new trial based upon legal insufficiency of the
evidence, the trial court must use the same standard of review as that used by
appellate courts, as set forth below. See State v. Savage, 905 S.W.2d 272, 274
(Tex. App.–San Antonio 1995), aff'd, 933 S.W.2d 497 (Tex. Crim. App.1996). The
trial court must decide, after reviewing the evidence in the light most favorable to the
verdict, whether any rational trier of fact could have found the essential elements of
the offense beyond a reasonable doubt. Id. When a motion for new trial challenges
the sufficiency of the evidence to support a jury's finding, the trial court cannot weigh
the evidence and judge the credibility of the witnesses. State v. Charlton, 847 S.W.2d
443, 446 (Tex. App.–Houston [1st Dist.] 1993, no pet.). The grant of a new trial on
the basis of legally insufficient evidence is equivalent to an acquittal. See Rodriguez
v. State, 852 S.W.2d 516, 519 (Tex. Crim. App. 1993) (en banc). The defendant
ordinarily has the burden of proof on a motion for new trial. See Patrick v. State, 906
S.W.2d 481, 498 (Tex. Crim. App.1995) (en banc). Whether the trial court abused
its discretion depends on the facts of each case. See Love v. State, 861 S.W.2d 899,
903 (Tex. Crim. App. 1993) (en banc). 
B. Standard of Review–Legal Sufficiency of the Evidence
         In measuring legal sufficiency in the context of a motion for new trial, the trial
court is bound by appellate legal sufficiency standards of review. See Savage, 905
S.W.2d at 274. A legal-sufficiency challenge calls for appellate review of the relevant
evidence in the light most favorable to the prosecution. Jackson v. Virginia, 443 U.S.
307, 319 (1979); Swearingen v. State, 101 S.W.3d 89, 95 (Tex. Crim. App. 2003)
(en banc); Johnson v. State, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000) (en banc). We
consider all the evidence that sustains the conviction, whether properly or improperly
admitted or whether introduced by the prosecution or the defense, in determining the
legal sufficiency of the evidence. Conner v. State, 67 S.W.3d 192, 197 (Tex. Crim.
App. 2001). 
         We measure the legal sufficiency of the evidence in this case against the
elements of the offense as defined by a hypothetically correct jury charge. Malik v.
State, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). A hypothetically correct jury
charge is one that "accurately sets out the law, is authorized by the indictment, does
not unnecessarily increase the State's burden of proof or unnecessarily restrict the
State's theories of liability, and adequately describes the particular offense for which
the defendant was tried." Id. A hypothetically correct jury charge would not simply
quote from the controlling statute. Gollihar, 46 S.W.3d at 254. Its scope is limited
by "the statutory elements of the offense . . . as modified by the charging instrument."
 Fuller v. State, 73 S.W.3d 250, 254 (Tex. Crim. App. 2002) (en banc) (Keller, P.J.,
concurring) (quoting Curry v. State, 30 S.W.3d 394, 404 (Tex. Crim. App. 2000)). 
         When a statute lists more than one method of committing an offense, and the
indictment alleges some, but not all, of the statutorily listed methods, the State is
limited to the methods alleged. Fuller, 73 S.W.3d at 255; Curry, 30 S.W.3d at 404. 
This standard of legal sufficiency ensures that a judgment of acquittal is reserved for
those situations in which there is an actual failure in the State's proof of the crime. 
Malik, 953 S.W.2d at 240. We then determine if any rational trier of fact could have
found the essential elements of the crime beyond a reasonable doubt. Jackson, 443
U.S. at 319; Johnson, 23 S.W.3d at 7. We are required to provide a remedy
tantamount to an appellate acquittal only when we determine that the evidence is
insufficient to support a conviction due to a failure of proof at trial with respect to the
guilt or innocence of the defendant. See Fuller, 73 S.W.3d at 253 (citing Burks v.
United States, 437 U.S. 1, 15-18 (1978)); see also Moff v. State, 131 S.W.3d 485,
489 (Tex. Crim. App. 2004). 
         In performing a legal-sufficiency review, we are mindful that the fact finder is
the exclusive judge of the credibility of witnesses and the weight to be given
testimony. Tex. Code Crim. Proc. Ann. art. 38.04 (Vernon 1979); Adelman v. State,
828 S.W.2d 418, 423 (Tex. Crim. App. 1992) (en banc); Butts v. State, 835 S.W.2d
147, 151 (Tex. App.–Corpus Christi 1992, pet. ref'd). The fact finder may believe
some witnesses and refuse to believe others. Esquivel v. State, 506 S.W.2d 613, 615
(Tex. Crim. App. 1974). It also may accept portions of a witness's testimony and
reject others. Id.; Butts, 835 S.W.2d at 151. 
C. General Verdict
         When the indictment alleges alternate theories of committing the same offense,
it is proper for the jury to be charged in the disjunctive and to return a general verdict
of guilty. Kitchens v. State, 823 S.W.2d 256, 258 (Tex. Crim. App. 1991) (en banc);
Tex. Code Crim. Proc. Ann. art. 37.07, § 1(a) (Vernon Supp. 2004-05) (verdict must
be general). The conviction will be upheld if the evidence is sufficient to support a
finding of guilt under any one of the theories submitted. Fuller v. State, 827 S.W.2d
919, 931 (Tex. Crim. App. 1992) (en banc); Kitchens, 823 S.W.2d at 258; see
Aguirre v. State, 732 S.W.2d 320, 326 (Tex. Crim. App. 1987) (en banc); Yandell v.
State, 46 S.W.3d 357, 363 (Tex. App.–Austin 2001, pet. ref'd). 
D. The Hypothetically Correct Jury Charge
1. The Elements of Conspiracy to Commit Barratry
         The indictment charged Mercier with barratry and conspiracy to commit
barratry. Tex. Pen. Code Ann. § 38.12(a), (b) (Vernon 2003); Tex. Pen. Code Ann. §
15.02(a) (Vernon 2003). The jury was charged on one count of conspiracy.


 The
charge included an instruction on barratry.


 By general verdict, the jury convicted
Mercier for the offense of conspiracy to commit barratry. The elements of the offense
of criminal conspiracy are: (1) a person, (2) with intent that a felony be committed, (3)
agrees with one or more persons that they or one or more of them engage in conduct
that would constitute the offense, and (4) he or one or more of them performs an
overt act in pursuance of the agreement. Tex. Pen. Code Ann. § 15.02(a) (Vernon
2003). The elements of the underlying felony offense of barratry are as follows: (1)
a person, (2) with intent to obtain an economic benefit,


 (3) engages in unlawful
conduct.


 Tex. Pen. Code Ann. § 38.12(a) (Vernon 2003). The plain language of this
statute demonstrates that the legislature intended to criminalize various forms of
solicitation of prospective legal clients by attorneys or their representatives. State v.
Mays, 967 S.W.2d 404, 408 (Tex. Crim. App. 1998) (en banc). 
         Thus, a hypothetically correct jury charge would instruct the jury that they could
find Mercier guilty of criminal conspiracy if: (1) he, (2) with the intent to obtain an
economic benefit, (3) agreed with one or more persons, (4) to pay or give or offer to
pay or give a person money or anything of value to solicit employment, and (5) one or
more of them committed an overt act. See Tex. Pen. Code Ann. § 38.12(a)(4) (Vernon
2003); see also Lopez v. State, 846 S.W.2d 90, 92-93 (Tex. App.–Corpus Christi
1992, pet. ref'd). 
         An agreement constituting a conspiracy may be inferred from the acts of the
parties. See Tex. Pen. Code Ann. § 15.02(b) (Vernon 2003). The essential element
of criminal conspiracy is an agreement to commit a crime. Cuellar v. State, 13 S.W.3d
449, 453 (Tex. App.–Corpus Christi 2000, no pet.) (citing Williams v. State, 646
S.W.2d 221, 222 (Tex. Crim. App. 1983)). Because conspirators' work is often done
in secrecy and under cover, direct evidence is not required to support a conviction for
criminal conspiracy; circumstantial evidence will suffice. Id. 
2. The Statutory Exception
         It is an exception to prosecution that the person's conduct is authorized by the
Texas Disciplinary Rules of Professional Conduct or any rule of court. Tex. Pen. Code
Ann. § 38.12(c) (Vernon 2003). The general rule is that where a penal statute
embraces an exception which is part of the statute itself, the State must negate the
exception in the indictment. Lopez, 846 S.W.2d at 93. 
D. Standards and Scope of Review–The Accomplice Witness Rule
         A conviction may not be based on the testimony of an accomplice witness
unless the accomplice's testimony is corroborated by other evidence tending to
connect the accused to the offense. Tex. Code Crim. Proc. Ann. art. 38.14 (Vernon
1979); Vasquez v. State, 67 S.W.3d 229, 236 (Tex. Crim. App. 2002) (citing Cathey
v. State, 992 S.W.2d 460, 462-63 (Tex. Crim. App. 1999), cert. denied, 528 U.S.
1082 (2000)). The evidence is insufficient if it proves merely the commission of the
offense. Cathey, 992 S.W.2d at 462. It is not necessary that the corroborating
evidence directly connect the defendant to the crime or that it be sufficient by itself
to establish guilt; it need only tend to connect the defendant to the offense. Id.; 
Vasquez, 67 S.W.3d at 236; Hernandez v. State, 939 S.W.2d 173, 176 (Tex. Crim.
App. 1997) (en banc). If the combined weight of the non-accomplice evidence tends
to connect the defendant to the offense, the requirement of article 38.14 has been
fulfilled. Cathey, 992 S.W.2d at 462; Reed v. State, 744 S.W.2d 112, 126 (Tex.
Crim. App. 1988) (en banc).
         To determine whether an accomplice's testimony is sufficiently corroborated,
we eliminate from consideration the testimony of the accomplice witness and examine
the remaining evidence to ascertain whether there is evidence that tends to connect
the accused to the offense. Hernandez v. State, 939 S.W.2d 173, 176 (Tex. Crim.
App. 1997) (en banc). We must view the corroborating evidence in the light most
favorable to the finding of guilt. Cantelon v. State, 85 S.W.3d 457, 461 (Tex.
App.–Austin 2002, no pet.). 
E. The Evidence
1. Exception to Prosecution
         The State's expert, Scott Rothenberg, testified that the Texas Disciplinary Rules
of Professional Conduct prohibit an attorney to pay a non-attorney for economic
benefits where the non-attorney referred cases to the attorney, namely, in exchange
for soliciting auto accident victims. According to Rothenberg, the conduct violated
rules 7.03(b) and (c) of the Disciplinary Rules. We conclude that the State negated
the exception within the statute. See Tex. Pen. Code Ann. § 38.12(c) (Vernon 2003);
Lopez, 846 S.W.2d at 93. 
2. Accomplice Evidence
         The defense argued during the motion for new trial hearing that the State's
witness, Angelica Rhodes, was "not an accomplice witness" and that Charlie Mora
was the only accomplice, based on the evidence at trial.


 The court's charge
instructed the jury that Mora was an accomplice. The court's charge contained,
generally, accomplice instructions. The defense argued that Brady evidence disclosed
post-trial showed Rhodes was also an accomplice. 
         An accomplice is a person who participates in an offense before, during, or after
its commission to the extent that the person can be charged with the offense or with
a lesser offense. Herron v. State, 86 S.W.3d 621, 631 (Tex. Crim. App. 2002) (en
banc) (citing Blake v. State, 971 S.W.2d 451, 454-55 (Tex. Crim. App. 1998) (en
banc)). An accomplice acts with the required culpable mental state. See Paredes v.
State, 129 S.W.3d 530, 536 (Tex. Crim. App. 2004). The participation must involve
an affirmative act that promoted the commission of the offense with which the
accused is charged. Id. An accomplice as a matter of law is one who is susceptible
to prosecution for the offense with which the accused is charged or a lesser-included
offense. Id. 
         A person is an accomplice if there is sufficient evidence connecting him or her
to the criminal offense as a blameworthy participant. See Blake, 971 S.W.2d at 455. 
"[T]he test is whether or not there is sufficient evidence in the record to support a
charge against" the witness alleged to be an accomplice. Id. To determine whether
the witness was an accomplice, we examine the record for evidence of the
participation in the crime. See id. Whether the person is actually charged and
prosecuted for their participation is irrelevant to the determination of accomplice
status–what matters is the evidence in the record. Id.    At trial, Rhodes recanted
material testimony she provided to the grand jury. She admitted she lied to the grand
jury. Nonetheless, viewed in the light most favorable to the verdict under the Jackson
standard of review, the evidence at trial showed that, in September 1997, Rhodes
attended a meeting between Mercier and Kent Plambeck in Mercier's law office.


 At
the time, Rhodes worked at Mercier's law office as a paralegal. Previously, Rhodes
had worked with Plambeck in his chiropractic office. According to Rhodes, the
meeting was called because Mercier needed to make payment on some auto accident
personal injury files. Plambeck and Mercier discussed a plan in which Plambeck would
refer clients to Mercier. In exchange, Mercier was to pay one hundred percent of the
medical expenses for injured patients Plambeck treated, who were also Mercier's
clients. According to Rhodes, the agreement between Plambeck and Mercier was to
obtain clients. Rhodes testified that Plambeck was frustrated that, in general, personal
injury attorneys requested a percentage reduction of his bill, and Plambeck wanted full
payment in personal injury cases. Rhodes testified that, as part of personal injury
practice, a medical narrative report was generated to assist attorneys in the settlement
of the claims with insurance companies. The usual fee for a narrative was $200 to
$250. Mercier agreed to pay $50 for the report; however, in reality, the fee was
payment toward the $500 fee per client charged by a "telemarketer" of clients, Charlie
Mora. According to Rhodes, Plambeck would pay the $450 balance of Mora's fee. 
         According to Rhodes, the agreement and operation in place was (1) Charlie
Mora, a "telemarketer," would meet persons involved in motor vehicle accidents at a
body shop, generally, to provide one of three property damage estimates required by
insurance companies;


 (2) the offer to estimate the cost of repair was to get the
person to go to the doctor or an attorney; (3) Mora would provide the potential client
the "800 number" to Mercier's law office, or a cell phone number, or call the office
directly and allow the potential client to speak to Rhodes; (3) Rhodes would visit the
caller in person and, as Mercier required, ask, "Are you asking for our services ?"; (4)
she would have the person execute a contract, intake sheet, and a form confirming the
person was asking for the services; (5) she would set up the client's appointment with
Plambeck's office; (6) Mora's work yielded ten to twenty new clients daily; and (7)
Mercier would pay the $50 out of settlement funds. Rhodes further testified that
Mercier's agreement with Mora to refer clients occurred by telephone but Plambeck
and Mercier met with Mora on several occasions. She heard Mercier tell Mora that the
body shop should pay him as a representative of the body shop in case of an
investigation. Mercier instructed Mora regarding the manner by which to approach
potential clients. Mora trained his workers to refer injured persons to Mercier. 
         Viewed through the prism of the abuse of discretion standard required in the
context of a new trial, we conclude that the trial court could have reasonably
concluded that Rhodes was an accomplice witness and that conclusion was within the
zone of reasonable disagreement. See Blake, 971 S.W.2d at 455; see Cantu, 842
S.W.2d. at 682. Under the accomplice witness rule, Rhodes' testimony required
corroboration. See Tex. Code Crim. Proc. Ann. art. 38.14 (Vernon 1979); Vasquez,
67 S.W.3d at 236. Thus, the hypothetically correct jury charge would have instructed
the jury that Rhodes, like Mora, was an accomplice witness.


 Malik, 953 S.W.2d at
240. 
         Before we review the non-accomplice testimony, we pause to consider Mora's
evidence at trial.


 Charles Mora testified he formerly owned Accident Care. He had
an office at Plambeck's clinic and at a body shop. He hired contract workers to market
for patients. Mora obtained the names of contacts from police reports. His workers
contacted persons involved in accidents to tell them they could receive a free
consultation at the clinic. Mora testified that Plambeck introduced him to Mercier. He
met with Mercier and discussed procedures "on how to approach the people on the
phone, and how to sign them up as in . . . how to get them to the body shop, and
how to get them to say that they wanted legal assistance." In 1997, Plambeck paid
Mora $300 for each patient referred. In turn, Mora paid the worker making the referral
$100. In September 1997, after Mora began working out of the body shop, he was
paid $500 per person referred. His objective in contacting vehicular accident victims
was to "get them to talk to an attorney–so they could go to the doctor so they can
get paid." The attorney, in particular, was Mercier. 
         Mora further testified on the State's direct examination:
Q. Whose idea was it for you to go out and give estimates for vehicles?
A. Whose idea was it?
Q. Yes.
A. Dr. Plambeck.
Q. And whose idea was it for you to move to Auto Kolors? Was that
your own or Dr. Plambecks?
A. I had an office in three different locations. I had one at the doctor's,
the Body Shop . . . . It was more convenient for us whichever we were
closer to. . . .
Q. [W]hen you were being paid for this $500 per client . . . where were
the checks coming from?
A. Different locations. I had–I don't remember the names. I know Dr.
Plambeck was paying me.
Q. Okay. Anybody else that was paying you that you remember?
A. No, not necessarily.
Q. When they were paying you, were they making checks payable to
you personally or payable to any of your companies?
A. Well, I had different companies.
Q. And what companies did you have? . . . 
A. . . . Accident Care Services . . . Independent Estimates . . . CMS
Construction Company. . . .

Mora testified that the money paid through these companies was for his referral 
services. He further testified:
Q. Did he–was Mr. Mercier supposed to pay you for any of the clients
that you referred?
A. I don't know if he was supposed to, I said, the first time. It wasn't
like he was supposed to pay me. It was never meant to be like that . .
.
Q. Did Mr. Mercier pay you any money for the referrals of the clients?
A. He gave me some money, yes, ma'am.
Q. And how much was that?
A. It was $4,000. . . .

          Finally, Mora testified he met with Mercier. Mora acknowledged his grand jury
testimony that the money from Mercier was for clients referred to Mercier and Mercier
was to pay $100 per person referred to him.


 
         Mindful that we must view the corroborating evidence in the light most
favorable to the finding of guilt, we turn to the testimony of non-accomplice
witnesses. Cantelon, 85 S.W.3d at 461. 
3. Non-accomplice Evidence
a. Former Clients 
         The State called numerous former clients of Mercier. Collectively, the testimony
of the witnesses showed: (1) involvement in vehicular accidents; (2) uninvited contact
from one or more persons by telephone or at home; (3) within a few days of the
accident (a) offering free estimates for property damage, (b) offering free consultations
with an attorney, Mercier, (c) offering free initial consultation for injuries through
Plambeck's clinic; (4) signing two documents at Mercier's law office; (5) employing
Mercier but contacting primarily his staff; and (6) settling their personal injury claims. 
Uniformly, the witnesses testified the visiting individuals told them they obtained
names and addresses from police department vehicular accident reports. As we must,
we have reviewed all the evidence at trial, whether properly or improperly admitted,
in the light most favorable to the verdict. See Moff, 131 S.W.3d at 492. We pause
to note some of the former clients' testimony before the jury.
         Araceli Cantu testified she was involved in a vehicular accident on August 11,
1998. Two men and a woman approached her daughter at the hospital while Cantu
was there in a coma after the accident. One man was named "Carlos" and the woman
was "Angie." Her family did not call Carlos or Angie to visit the hospital. Her
daughter had "accepted" Mercier to handle Cantu's claim. While recovering in the
hospital, Cantu signed two documents admitted in evidence. In one, she
acknowledged she requested a free consultation with Mercier's office. The form
continues, "I was referred over to this office by representatives of the body shop or
a car rental agency. I never discussed any attorneys with a telemarketer." After
Cantu was released, she was referred to Plambeck's clinic. She assumed Mercier's
office made the referral. Mercier's office settled her case.  
         Omar Garza testified he was involved in a vehicular accident in 1998. Two men
visited his home to provide an estimate on his truck, representing they were from a
body shop. Garza did not call them. He did not ask them for an attorney. The two
men did not provide an estimate. They referred him to Mercier's office. Once there,
he was referred to Plambeck's clinic. He signed the form admitted in evidence stating,
"I request a free consultation with the law office" of Mercier. He signed another
document, admitted in evidence stating, "I request a free consultation with the law
office of Eugene Mercier. I was referred over to the office by a representative of a
body shop or a car rental agency. I never discussed any attorneys with a
telemarketer." Mercier's office settled his case.
         Esmeralda Fuentes testified that she was involved in a car accident in 1998. 
An adjuster named "Vicente" contacted her home. Once there, he called "Angie" who
worked at Mercier's office. Fuentes already had an attorney. At Angie's suggestion
that the attorney was not reputable, Fuentes completed a release form to release the
attorney and hired Mercier. She was referred to Plambeck's office.
         Carlos Garcia testified he was involved in a car accident and, the next day,
Rhodes contacted him and identified herself as Mercier's legal assistant. He did not
request the visit. She arrived unexpectedly and had forms that he signed. Garcia
went to Mercier's office and was referred to Plambeck's clinic. He signed the forms
containing the free consultation and referral information. A man named Joe Garcia
from a body shop picked up his vehicle for repair but did not repair it–another body
shop did. Mercier's office settled his case. 
         Alonso De Leon testified that he was involved in a vehicular accident in 1998. 
A man from a body shop called him the following day and told him he could get his
truck fixed without a problem. The caller told him he knew a lawyer who could help
De Leon. They met the next day at Mercier's office. Another man provided "Raul"
from Mercier's office an estimate of the vehicle completed at the office. "Raul"
explained he obtained De Leon's name from the police report. De Leon was referred
to Plambeck's clinic. At "Raul's" request, De Leon signed the two forms regarding the
free consultation and referral information. De Leon's vehicle was not repaired. His
case was settled.
         Numerous witnesses testified similarly. Another witness, Stacie Palmer,
testified that she managed Plambeck's accounts in 1998. She recalled writing several
checks in payment to Mora and to his wife. Sergeant Israel Pacheco, with the Texas
Rangers, testified that he began investigating Mercier and Plambeck in 1998. He
testified that Rhodes was arrested for bribing one of the Department of Public Services
secretaries in Harlingen by paying the secretary money for copies of accident reports.
2. Former Employees
          Raul Ortiz testified he previously worked with Mercier. He knew of one
meeting lasting about two hours between Mercier and Plambeck. Rhodes was present
at the meeting. Rhodes called Ortiz into the office where the meeting took place
because Mercier and Plambeck were in an altercation. When Ortiz entered, he noticed
Plambeck looked upset and observed Mercier fixing his tie. Ortiz, like Rhodes, signed
up clients daily. Mora referred some clients directly and others called the firm's toll-free telephone number. In 1998, most of the referrals were from Mora and many of
the firm's referrals were to Plambeck's clinic. Ortiz saw Mora visit the law office
about twice a week. Ortiz had instructions to further refer Mora's referrals to
Plambeck's clinic.


 
         Armando Valdez testified he worked for Mora in 1997 , telemarketing for clinics
at Mora's business, Accident Care. Valdez described his duties as calling persons
involved in auto accidents to ask if they wanted a no-cost check-up at the clinic. Mora
made the decision as to whom to call. The insurance of the party at fault would be
billed. Eventually, Mora's business moved to a body shop. There, Valdez contacted
persons identified in police accident reports about providing a free estimate for
property damage. While at the contact's home, Valdez would refer them to an
attorney if they wanted one. The referrals were mainly to Mercier. Valdez made the
call to Mercier's office, either asking for Rhodes or dialing the toll-free number. 
Sometimes Valdez provided transportation to the office. Mora made the decision to
refer the persons contacted to Mercier. According to Valdez, from "there they would
be sent to the clinic and if they needed treatment, we would get paid from the clinic." 
The clinic involved was Plambeck's clinic. Plambeck paid Mora, and Mora paid Valdez
by check at the rate of one hundred dollars per person referred when the person visited
the clinic three times.


 Mora kept a list of the persons referred. Valdez referred
approximately fifteen persons every two weeks to Mercier's office. 
         Carlos Herrera testified he formerly worked for Mora in 1997 at Accident Care. 
While there, he "telemarketed auto accident victims." Mora gave him a list and told
him to call the persons. Mora obtained accident reports from the police department. 
Mora paid him $75 per person and then later $100 per person he contacted who
received treatment at a clinic. The "doctor" paid Mora. Herrera referred approximately
twenty people a month. When the office moved to the body shop, he called persons
involved in accidents to provide free property damage estimates. He referred persons
to Mercier when they needed assistance securing a rental vehicle.
F. Disposition
           The trial court order set aside the jury verdict of guilty, granted Mercier's
motion for new trial, and entered an acquittal based on legal insufficiency of the
evidence, a ground squarely before it. We must decide whether the trial court's
decision was so clearly wrong as to lie outside that zone within which reasonable
persons might disagree. Cantu, 842 S.W.2d at 682. 
         The trial court was present when the witnesses testified and the evidence
presented. In material parts, Rhodes' testimony at trial differed from her testimony
before the grand jury, and she admitted she lied during the grand jury proceeding. 
Similarly, Mora's testimony was deferential to his grand jury testimony but non-committal to its veracity. In the light most favorable to the verdict, the evidence
showed that a system was in place to target vehicular accident victims, contact them
unannounced and uninvited, refer them to Mercier's law office, from there refer them
to Plambeck's clinic, and secure settlement of personal injury claims. According to
Rhodes, Mercier and Plambeck agreed that Mercier would pay $50 toward Mora's
$500 fee. According to Mora, Plambeck paid him through Mora's three different
business entities for obtaining patients. 
         We are mindful that the essential element of criminal conspiracy in this case
was an agreement to commit barratry. See Cuellar, 13 S.W.3d at 453. Because
conspirators' work is often done in secrecy and under cover, direct evidence is not
required to support a conviction for criminal conspiracy; circumstantial evidence will
suffice. Id. At trial, Mora acknowledged his grand jury testimony that Mercier paid
him $4,000 for referring clients. Mora declined to testify as to the truth of the
testimony. Because he was an accomplice, Mora's testimony required corroboration. 
Cathey, 992 S.W.2d at 462. Rhodes testified that Mercier agreed with Plambeck to
pay $50 toward Mora's fee. Because a hypothetically correct jury charge would have
instructed the jury that Rhodes was an accomplice witness, her testimony also
required corroboration. Id.; Malik, 953 S.W.2d at 240. A reasonable inference is that
the trial court had reason to doubt Mora's and Rhodes' credibility. See Charles, 146
S.W.3d at 206; see also Johnson, 571 S.W.2d at 173; Esquivel, 506 S.W.2d at 615. 
We must defer to the trial court's resolution of historical facts. Charles, 146 S.W.3d
at 206.
         Ruling on a motion for new trial based upon legal insufficiency of the evidence
required the trial court to use the same standard of review as that used by appellate
courts. See Savage, 905 S.W.2d at 274; Jackson, 443 U.S. at 319. Viewed in the
light most favorable to the verdict, evidence adduced by non-accomplice witnesses
establishes that they signed documents requesting Mercier's legal services and
identifying a referral source. The witnesses did not initiate the contact they had with
persons from Mercier's law office offering post-accident services. Once contacted,
the witnesses hired Mercier to represent them and were referred to Plambeck's clinic. 
Some of the witnesses identified Rhodes by name. Mercier's former employee Ortiz
testified that: (1) Mora visited the law office about twice a week; (2) in 1998, most
of the referrals were from Mora and to Plambeck; and (3) Ortiz had instructions to
further refer Mora's referrals to Plambeck's clinic. Once, Mercier paid Mora
$4,000.00.
         Viewing the evidence favorably to the verdict and eliminating from consideration
testimony of the accomplice witnesses, Mora and Rhodes, in the context of a legal
sufficiency challenge at the motion for new trial phase, the trial court must consider
whether there was evidence tending to connect Mercier to the conspiracy. Thus, the
trial court must consider evidence of the essential element of an agreement to commit
barratry. Mercier's former employee, Ortiz, testified as to: (1) Mora's presence in
Mercier's office twice weekly; and (2) the instruction that Mora's referrals be further
referred to Plambeck. See Hernandez, 939 S.W.2d at 176. The trial court could have
concluded that the combined weight of the non-accomplice evidence did not
sufficiently link Mercier to the offense and, thus, the requirement of article 38.14 was
not fulfilled. Id.; see Hughes v. State, 24 S.W.3d 833, 840 n.4 (Tex. Crim. App.
2000). After resolving the historical facts and applying the appellate standard for legal
sufficiency, the trial court could have concluded that the State did not prove the
essential element of an intent to conspire. Similarly, whether the affirmative link
factors, viewed in the light most favorable to the prosecution, established the essential
element of criminal conspiracy, namely, an agreement to commit barratry, was
squarely before the trial court. The trial court concluded the evidence was legally
insufficient. 
         Even so, the trial court was bound by legal sufficiency standards in Jackson,
443 U.S. at 319; see Savage, 905 S.W.2d at 274. In the light most favorable to the
jury's verdict, the evidence shows that Mercier agreed with one or more persons to
"telemarket" vehicular accident victims to increase his business income. The evidence
shows Mercier paid Mora, admittedly Plambeck's employee, $4,000 for his work in
identifying, contacting, and engaging vehicular accident victims. Non-accomplice
evidence shows Mora paid his own employees to refer persons to Mercier's office. A
jury could reasonably infer the requisite intent from two requirements in place at the
law office, that: (1) solicited persons must execute forms indicating the referral source
and requesting Mercier's legal services; and (2) persons solicited by Mora, once signed
as clients, must be referred to Plambeck's clinic. 
         The jury, as the trier of fact, may use common sense and apply common
knowledge, observation, and experience gained in ordinary affairs when giving effect
to the inferences that may be reasonably drawn from the evidence. Booker v. State,
929 S.W.2d 57, 60 (Tex. App.–Beaumont 1996, pet. ref'd). As fact finder, the jury
is free to accept one version of the facts, reject another, or reject all or any of a
witness's testimony. Penagraph v. State, 623 S.W.2d 341, 343 (Tex. Crim. App.
[Panel Op.] 1981). Simply because the defendant presents a different version of the
facts does not render the State's evidence insufficient. Anderson v. State, 701
S.W.2d 868, 872 (Tex. Crim. App. 1985). As the reviewing court, we may not sit as
a thirteenth juror and disregard or reweigh the evidence. Moreno v. State, 755
S.W.2d 866, 867 (Tex. Crim. App. 1988) (en banc). 
         After reviewing all the evidence, we conclude that a rational trier of fact could
have found beyond a reasonable doubt the essential elements of the offense. We
conclude the evidence is legally sufficient. Thus, even applying deferential standards
as we must, we conclude that, on this record, the trial court abused its discretion in
granting a new trial and vacating the verdict on legal insufficiency grounds. We
sustain the State's second issue. We overrule Mercier's fourth cross-point. 
IV. CONCLUSION
         We reverse the trial court's order. We remand the cause for entry of judgment
reflecting the jury's verdict. We need not reach the State's third and fourth issues. 
See Tex. R. App. P. 47.1. Similarly, we do not reach Mercier's remaining cross-points.
Id.  
                                                                        ERRLINDA CASTILLO
                                                                        Justice
Publish
Tex. R. App. P. 47.2(b)
 
Opinion delivered and filed 
this 19th day of May, 2005.