COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | § | |
|---|---|---|
| ARTURO TENA, | § | No. 08-15-00152-CR |
| Appellant, | § | Appeal from |
| v. | § | 210th District Court |
| THE STATE OF TEXAS, | § | of El Paso County, Texas |
| Appellee. | § | (TC # 20140D01366) |
| | § | |

## **O P I N I O N**

A jury convicted Arturo Tena Jr. of injury to a child, resulting in an eight-year sentence and the maximum possible fine. The sole issue on appeal is the legal sufficiency of the evidence to support the conviction. We affirm.

### **FACTUAL SUMMARY**

The State indicted Appellant for causing injury to the three-year-old daughter of his girlfriend. We identify the child with the pseudonym Jane, and the girlfriend by her first name, Jessica.[1] Jane presented to the emergency room at University Medical Center at 4:10 p.m. on November 8, 2013, in an apparent seizure. Her condition was triaged as a "Level I Trauma," the most severe on the hospital's rating scale. A CT scan of her head, performed at 4:40 p.m., showed

---

[1] *See Daggett v. State,* 187 S.W.3d 444, 446 n.3 (Tex.Crim.App. 2005)(noting use of alias identification to protect the identity of the child); *McClendon v. State,* 643 S.W.2d 936, 936 n.1 (Tex.Crim.App. [Panel Op.] 1982)(same); *cf.* TEX.R.APP.P. 9.8 (use of alias names in parental right and juvenile cases).

a significant intracranial hemorrhage that was pushing and compressing her brain to one side of the skull. Jane was taken immediately to the operating room where a surgical team performed a craniotomy. That procedure opens the skull and relieves the pressure on the brain. During the procedure, the surgeon discovered active bleeding from veins in the superior sagittal sinus, which he was able to repair.[2] Jane survived and recovered from the injury.

At trial, the State's case against Appellant focused on the following arguments:

1) A tear in the superior sagittal sinus must be caused by some form of blunt force trauma to the head;

2a) Given the nature of the bleeding observed, the injury would have occurred 2-3 hours before the time of the CT scan; or

2b) Given the nature of the bleeding observed, the child would have exhibited immediate and profound symptoms following the injury;

3) Appellant had the sole custody of the child in the relevant part of the three-hour period prior to the CT scan, and when he took control of the child, she was not exhibiting any profound symptoms of a head injury.

The State thus concluded that Appellant inflicted some trauma on the child by either striking her head against some object, or striking some object against her head.[3] On appeal, Appellant's sole point of error challenges the legal sufficiency of the evidence to support the jury's finding of guilt. We start with a reminder of the appropriate standard of review, and next recite the evidence germane to the three tenets of the State's theory advanced to support the conviction.

**STANDARD OF REVIEW**

Evidence is legally sufficient when, viewed in the light most favorable to the verdict, *any* rational jury could have found the essential elements of the offense beyond a reasonable doubt.

---

[2] The superior sagittal sinus is an area of the brain that runs somewhat along the top of the brain and between the right and left brain lobes. This area collects and drains blood into the jugular vein. Richard M. Patterson, 4a *Lawyer Medical Cyclopedia*, § 32.6 (2016).

[3] The State also indicted Appellant for injury to Jane by omission, arguing that he delayed in getting help for the child. The trial court directed a verdict on that Count, and we therefore we find it unnecessary to discuss the facts developed below that relate exclusively to that Count.

2

*Jackson v. Virginia*, 443 U.S. 307, 318-19, 99 S.Ct. 2781, 2788-89, 61 L.Ed.2d 560 (1979); *Brooks v. State*, 323 S.W.3d 893, 912 (Tex.Crim.App. 2010)(establishing legal insufficiency under *Jackson v. Virginia* as the only standard for review of the evidence).

The jury is the sole judge of credibility and the weight attached to the testimony of each witness. *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex.Crim.App. 2014). It is the fact finder's duty "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *See Clayton v. State*, 235 S.W.3d 772, 778 (Tex.Crim.App. 2007), *quoting Jackson*, 443 U.S. at 319, 99 S.Ct. 2781. The jury also may choose to believe or disbelieve that testimony. *Lancon v. State*, 253 S.W.3d 699, 707 (Tex.Crim.App. 2008); *Belton v. State*, 900 S.W.2d 886, 897 (Tex.App.--El Paso 1995, pet. ref'd). When the record supports conflicting inferences, we presume that the jury resolved the conflicts in favor of the verdict, and we defer to that determination. *Dobbs*, 434 S.W.3d at 170; *see also Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789.

Circumstantial evidence is as probative as direct evidence in establishing guilt, and circumstantial evidence alone may be sufficient to establish guilt. *Dobbs*, 434 S.W.3d at 170; *Carrizales v. State*, 414 S.W.3d 737, 742 n.20 (Tex.Crim.App. 2013), *citing Hooper v. State*, 214 S.W.3d 9, 13 (Tex.Crim.App. 2007). Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Dobbs*, 434 S.W.3d at 170; *Hooper*, 214 S.W.3d at 13.

We remain mindful that "[t]here is no higher burden of proof in any trial, criminal or civil, and there is no higher standard of appellate review than the standard mandated by *Jackson.*" *Brooks*, 323 S.W.3d at 917 (Cochran, J., concurring). Nonetheless, if a rational fact finder could

have found the defendant guilty, we will not disturb the verdict on appeal. *Fernandez v. State*, 479 S.W.3d 835, 838 (Tex.Crim.App. 2016).

### EVENTS LEADING TO JANE'S HOSPITALIZATION

Jane is the three-year old daughter of Jessica. They lived with Appellant, who at the time of this incident had three children of his own: a three-year-old daughter, and two sons aged six and eight. On the morning of the incident, the boys would have left for school between 7:00 and 7:30 am. By 9:00 a.m., Jessica got the two three-year-old girls ready to go shopping with Appellant's mother. She helped both children dress and fix their hair. Jessica noticed nothing unusual about Jane's scalp or head while doing her hair. The girls may have also gone out to play on a trampoline in the back yard. Appellant was asleep as all this was going on.

Appellant's mother picked up Jessica and the girls at 10:00 a.m. They went by two banks before shopping. Jane misbehaved while in the first bank, so when they got to the second bank, she stayed in the car with her mother. When Appellant's mother left to go inside the second bank, the three-year-olds were arguing. When she returned, Jane appeared to be dozing off as she was sleepy. They all then went into a JC Penney store for about forty-five minutes. The jury saw seven minutes of footage captured by the store's surveillance cameras. While in the store, Jane was at first running around, but calmed down when she realized the adults were displeased with her behavior. Jane was more aggressive than usual that morning, but then said she was tired towards the end of trip. Her mother also recalled that Jane complained of being sick and had "a little bit of a cough" at some point in the morning.

Appellant's mother dropped Jessica and the girls off at the house around noon. They had originally planned to go lunch, but decided not to because of Jane's poor behavior that morning. Jessica was upset with the child, enough so that she was in tears. Appellant, who was the

disciplinarian of the household, then took over watching Jane. He used "time out," talking to the children, and then only as a last resort, hand spanking on the rear. He would also sometimes have Jane stay with him when she misbehaved.

Appellant is a diesel engine mechanic. That day he received a call from his boss about a job. He took Jane with him to the jobsite at Jessica's request. Depending on whose recollection was correct, he left the house with Jane at either 1:00 p.m. or 1:40 p.m. Up to this point, Jane never said her head hurt, she had not vomited, she was walking on her own, and never complained that something happened to her.

Appellant recalled that Jane was acting normal when they left the house, but was crying.[4] When he got to the shop, she stayed in the car while he was working on a truck a few feet away. She played with her toys for a short time then laid down in the car's floorboard to sleep. Appellant claimed he checked on her several times. He talked to her and she responded to him. Appellant called Jessica around 2:00 p.m. to check in and discuss dinner. He then left the shop at 3:00 p.m. to pick up his boys from school. When he got to the school, he moved Jane to the front seat so his boys could sit in the back. Only after picking up his boys and while on the way home did he notice that she was not waking up. He splashed water in her face to no effect and at that point became concerned about her condition.[5]

Jessica got a call from Appellant at 3:17 p.m. telling her something was wrong with Jane as she was not waking up. He sounded panicked. They arrived at the house a few minutes later. Appellant tried to revive Jane in the shower with cold water. When that did not work, they all left in the car headed towards a nearby fire station. On the way, however, they spotted a police cruiser

---

[4] Appellant did not testify at trial, but a taped interview with two detectives was played to the jury.

[5] One of Appellant's sons testified at trial, however, that by the time they were picked up, Appellant already appeared "worried" and was trying wake Jane up. The backseat was already wet.

by the side of the road and stopped there. The officer called for fire paramedics and EMS. Jane was unresponsive at the scene. The officer recalled that Jessica was "hysterical" and Appellant appeared nervous and looked worried.

Another responding officer talked to both Appellant and Jessica. He recalled that Appellant appeared to be calm. Appellant told that officer that Jane had been inside his car while he worked on a truck motor. He claimed that Jane appeared comfortable and wasn't displaying any of her current symptoms. She was sleeping in the car, and only after he picked up his other children at the school did he notice that Jane was "stiffening up" and showing seizure like behavior. When the officer spoke to Jessica on the other hand, she was highly distressed, yelling, screaming, and sitting on sidewalk rocking back and forth. She told the officer that "I'll do better, please, I'll be a better person."

EMS and paramedics arrived quickly. As they cut off Jane's clothing, the paramedics noticed several bruises in varying stages of healing on the child's back and the front of her legs. Upon seeing these, Jessica asked, "where did all those bruises come from?" At trial, she testified that the bruises on the back came from the night before when Jane fell in the shower. Jessica also claimed the other bruising was from where they carried child while trying to revive her, or normal bruising on legs for child.

At the time of trial, Jessica was still living with Appellant. She denied doing anything to cause the head trauma, nor did she believe that Appellant caused the injury to the child.[6] During Appellant's interview with detectives later that evening, he repeatedly denied doing anything to hurt Jane. Near the end of the interview, however, he did acknowledge that he hand-spanked her bottom that day. One detective who met with Appellant that night testified that as they shook

---

[6] After this incident, Child Protective Services removed all the children from the household and placed them with relatives or foster care.

6

hands, Appellant pulled his hand away immediately, saying that he had hurt his hand at work earlier that day.

## THE MEDICAL TESTIMONY

The State developed much of its case through the testimony of four doctors: Dr. Sanjay Misra, the neurosurgeon who performed the craniotomy; Dr. Benjamin Carcamo, a hematologist who investigated blood clotting concerns; Dr. Alan Tyroch, the surgeon who headed the trauma team; and Dr. Steven Ross, the pediatric radiologist who read the CT scan. No challenge was made to the qualifications of any of the doctors generally, nor to any of the specific opinions that they offered at trial. As we alluded to earlier, the State advanced two major propositions through these witnesses: the subdural hemorrhage was the result of blunt force trauma, and either the nature of the brain bleed or the history of when the child demonstrated symptoms, placed the child in Appellant's care at the time of injury. We elaborate in a bit more detail on each contention.

### The Cause of the Injury

The CT scan at the hospital showed an accumulation of blood on the right side of Jane's head just under the skull pushing the brain to the opposite side. It did not show any fracture of the skull itself.[7] Dr. Misra performed a craniotomy to open a window through the skull that allowed the clotted blood to escape and reduce pressure on the brain. When he did so, he discovered an active bleed in the superior sagittal sinus.

Dr. Misra did not know how the injury occurred, other than something traumatic had to have happened to Jane's head. The injury could be consistent with a fall, depending on the surface that she fell on, and Dr. Misra noted the example of a fall down a flight of stairs Dr. Ross, the

---

[7] Dr. Tyroch testified that a fracture of the skull is not predictive of a head injury. The doctors also did a "long bone scan" which surveys all the bones of the body, and found no healed or healing fractures, nor did an abdominal CT normal show any injury to internal organs.

radiologist, testified that the injury was the result of head trauma, likely a blow to the top of the skull. The traumatic impact would be consistent with a direct blow or serious fall. He thought it inconsistent with the "usual injury of usual children with usual play." Dr. Tyroch testified that based on the CT scan, the clinical exam, and the "blown pupil" on one side, the injury was consistent with severe blunt trauma. The injury could have come from a fall, but it would be from a height of one or two stories.

### The Timing of the Injury Based on the Nature of the Bleed

The doctors in part deduced the timing of the injury based on the nature of the bleeding they witnessed. Dr. Tyroch testified that the severe traumatic brain injury represented on the CT scan meant that the blood had collected with a "very, very rapid onset." Brain bleeds can be chronic (long term), acute, or hyperacute. Dr. Misra testified that an acute brain bleed starts within four to six hours, while the beginning of a hyperacute bleed would be "something shorter" in time. Dr. Misra believed that Jane's bleed had features of a hyperacute bleed, but he agreed that the two cannot be distinguished with any certainty as there are no clear criteria for hyperacute bleeds. Nonetheless, the bleeding he witnessed was "less consistent with a six hour old injury," unless the bleeding had stopped and restarted.

Dr. Ross read the CT scan at 4:43 pm. He also noted the bleed was more compatible with a hyperacute brain hemorrhage. The accumulating blood was "very fresh" meaning it occurred within the last couple of hours. In his words, the blood had accumulated within an approximate span of two hours. He later testified the bleeding could have started within ten minutes to three hours.

Appellant developed testimony that Dr. Misra could not say when this bleed began, or how long it had been actively bleeding. At least according to the investigating detective, Dr. Misra told

8

him that the bleed could have started as many as twelve hours before the onset of symptoms, although Dr. Misra denied making this statement.  Dr. Tyroch had told the detective that he could not for certain rule out a chronic bleed.  Dr. Ross allegedly told the same investigator that it was possible that the injury could have occurred within one to one and a half days preceding the CT scan.  He also told the investigator that the onset of symptoms would be immediate.  Much of the medical testimony addresses this later point -- how would Jane have reacted when this brain bleed began.

### The Timing of the Injury Based on the Development of Symptoms

Dr. Misra testified that a child will manifest immediate symptoms with a brain bleed because there is no room in child's skull for extra fluids.  It is thus unlikely for a child to be "asymptomatic" for three hours following the formation of blood clots in the brain.  Rather, the "child would have started to do something that would have been out of the norm for that child." Children of that age could start pulling at their hair, become irritable, complain of a headache, engage in wild behavior, vomit, cry for no reason, or show a loss of responsiveness.  A child would not simply go from talking or watching TV to sudden unconsciousness and seizures.  Within a couple of hours, the child would not be in the mood to walk.[8]

Drs. Ross and Tyroch were more emphatic.  Dr. Ross testified that the initial injury-causing event would be painful in itself and elicit an immediate outcry from the child.  After the child overcomes the initial blow, the symptoms from the brain bleed might be gradual, but would still evolve within several hours.  As blood accumulates, the child's cognitive function will progressively change, and manifest in strange behavior and a headache.   The child might also

---

[8]  Appellant attempted to develop the concept of "delayed deterioration" through cross-examination.  The theory suggests that there might be a delayed onset of symptoms from the time of injury.  Dr. Misra acknowledged the concept, but testified that depending on the definition of terms used, he either did not know that the concept applied, or it was not germane in this case based on degree of bleeding.

9

transition from being hyperactive to sleepy.  Dr. Ross testified that this injury "hurts."  In fifteen to thirty minutes following the injury, the child would be in distress and would not appear normal. In sum, he opined that there had to be a painful traumatic event after 1:43 p.m. that afternoon:

> [STATE'S ATTORNEY]: Okay. Because even extrapolating this [CT scan] image backwards up to the three hours you gave it, that would put us at about 1:43; is that correct?
>
> [DR. ROSS]: That's right.
>
> [STATE'S ATTORNEY]: Okay. And a painful traumatic event had to have occurred to cause this?
>
> [DR. ROSS]:  Yes.
>
> [STATE'S ATTORNEY]: That child was in pain?
>
> [DR. ROSS]:  Yes.

Dr. Tyroch testified that someone exhibiting a blown pupil and venous bleed, would show symptoms "very quickly," as within an hour or two of the event or even sooner.  The child would manifest symptoms, such as brief unconsciousness or vomiting, and definitely would not have been able to walk around a store for 45 minutes.

None of the doctors expressed a direct opinion of who injured Jane, but Dr. Tyroch answered the following hypothetical that the jury could have applied to the chronology of events:

> [STATE'S ATTORNEY]: Okay. Well, what if Caretaker B assumed custody of the child even before 2:00, but Caretaker B says, this child had no symptoms when I got her?
>
> [DR. TYROCH]: Something must have happened after Caretaker B took care of the child.
>
> [STATE'S ATTORNEY]: That's the only way?
>
> [DR. TYROCH]:  In my mind, yes, sir. The child would have been already having some altered behavior if something had happened before Caretaker B got involved.
>
> [STATE'S ATTORNEY]: Okay. And by altered behavior, are we talking I'm just a little bit sleepy or --
>
> [DR. TYROCH]: Complaining of nausea, sleepy, vomiting, starting to maybe having some seizure-like activity.

10

[STATE'S ATTORNEY]: And the nature of this type of injury, is it something that the caretaker, whether it's Caretaker A or B, is going to be aware of when that child sustains it?

[DR. TYROCH]: I would think most definitely, yes, sir.

## Possible Other Causes

Appellant attempted to develop a theory that a pre-existing bleeding disorder may have played a role in Jane's condition. After the successful surgery to repair the brain bleed, Dr. Tyroch obtained a hematology consult with Dr. Benjamin Carcamo to investigate any coagulation disorders that Jane may have had. A coagulation disorder could cause a spontaneous hemorrhage, or explain how a lesser force could result in a large brain bleed. Dr. Carcamo first concluded that Jane had a disseminating intravascular coagulation process that *was caused* by the traumatic event. But he opined that the kind of bleed in Jane's brain was first caused by a traumatic event. In his words, "For this kind of bleed, you have to have a traumatic event. I mean, the traumatic event was the cause." Jane did have a pre-existing platelet disorder which Dr. Carcamo described as "very mild" and comparable to something less than taking an aspirin. The pre-existing platelet disorder might manifest in nose or gum bleeds, or make the child more susceptible to bruising, but it would not explain her cranial bleed.[9]

Appellant also suggested at trial that Jane could have injured herself on the family trampoline or elsewhere in the back yard. She was noted to be a clumsy child, who had bruising on her shins from rough play. Jane had behavioral problems, would throw temper tantrums, and fight with her cousins. She would also hit her head against walls, and scratch her own face. Some of the testimony from the medical witnesses discounted that Jane could have self-inflicted a blow sufficient to cause the injury they observed. The timeline for the injury and resulting symptoms

---

[9] The State also called Dr. Rodolfo Fierro-Stevens who followed Jane after her discharge from the hospital. His records note that an underlying pro-thrombotic condition needed to be followed, but he did not testify it was the cause of the original brain bleed.

11

established by some of the medical testimony would also be inconsistent with an injury the day before, or even that morning.

## **Applicable Law**

A person commits the offense of injury to a child if he recklessly causes serious bodily injury to a child fourteen years or younger. TEX.PEN.CODE ANN. § 22.04(a)(1)(West Supp. 2016). Proving these crimes often depends on circumstantial evidence because "there is rarely direct evidence of exactly how the child's injuries occurred." *Williams v. State*, 294 S.W.3d 674, 683 (Tex.App.--Houston [1st Dist.] 2009, pet. ref'd). The same is true here, as there were no direct witnesses to any abuse. Jane never told anyone that Appellant hurt her, and the State concluded that she was too young to differentiate the truth from a lie such that she did not testify. The State thus relied on proving who had sole access to the child at the time of injury. And indeed, "Texas case law is replete with holdings that when an adult defendant has had sole access to a child at the time its injuries are sustained, the evidence is sufficient to support a conviction" for injury to a child. *Garcia v. State*, 16 S.W.3d 401, 405 (Tex.App.--El Paso 2000, pet. ref'd); *see also Bearnth v. State*, 361 S.W.3d 135, 140 (Tex.App.--Houston [1st Dist.] 2011, pet ref'd)(upholding verdict based on sole access and medical testimony of when injury must have occurred); *Bryant v. State*, 909 S.W.2d 579, 583 (Tex.App.--Tyler 1995, no pet.)(where evidence showed child had been left alone with defendant and injuries to child occurred approximately thirty minutes prior to child being brought to emergency room, evidence was sufficient to support conviction); *Elledge v. State*, 890 S.W.2d 843, 846 (Tex.App.--Austin 1994, pet. ref'd)(undisputed medical testimony placing adult defendant alone with child when fatal injuries were sustained supported conviction for injury to a child); *Butts v. State*, 835 S.W.2d 147, 151 (Tex.App.--Corpus Christi 1992, pet. ref'd)(injuries

sustained by child were shown by medical testimony to have occurred at time adult defendant admitted to sole possession of child).

## Was the Evidence Legally Sufficient?

Considering all of the evidence together, we conclude there is sufficient evidence supporting the jury's finding that Appellant recklessly caused serious bodily injury to Jane. Other than for a minor clotting dysfunction that would be equivalent to less than taking an aspirin, the child was a healthy three-year-old prior to November 8, 2013. The consensus from all four testifying doctors was that the injury resulted from some type of trauma. Two of the doctors describe a significant blunt force trauma. While they could not rule out a fall, the kind of fall they described would have been spectacular, such as down a flight of stairs or off a one or two story structure. Such trauma was not of a kind that children inflict on themselves in everyday play.

The question then becomes one of timing -- who had control of the child at the time of injury. Jessica was with Jane from 9:00 a.m. to just past noon. Appellant's mother was also with Jane for much of the morning. During that time period, the child was able to walk and stand on her own. She never complained that her head hurt, nor had she vomited. There was some opportunity for Jane to have hurt herself on the trampoline earlier that morning, but her mother did not notice any swelling or tenderness while fixing the child's hair. Jane had misbehaved that morning, and had gone from being hyperactive to calm, but there was some testimony that she did so because of the scolding from both her mother and Appellant's mother.

Once back at the house, Appellant had sole contact with Jane from 1:00 p.m. until she started exhibiting profound symptoms. On appeal, he contends that variances in the medical opinions belie any conclusion that she must have been injured in this time frame. While the doctors did not universally agree, Drs. Ross and Tyroch placed the time of injury within a few hours of the

13

CT scan, which would be just after 1:00 p.m. when Appellant had sole care for the child. Additionally, the time of injury can also be calculated from the onset of symptoms. In Appellant's statement, he claimed Jane was normal when she was first with him. Dr. Tyroch and Ross' testimony, however, support the conclusion that Jane would have been much more symptomatic had she injured herself before Appellant took over her care. For instance, she could not have walked around the JC Penney store for 45 minutes had she injured herself before they arrived at the store that morning.

Medicine is often described as an art,[10] but in this case the science of medicine, and the precision with which some of the medical witnesses used to describe the timing of the injury, dictate our ultimate conclusion. The jury was free to, and we must assume they did, discount the conflicting medical testimony that Appellant emphasizes to break the State's time line. The testimony of Drs. Ross and Tyroch would support a rational trier of fact's conclusion that some blunt force trauma befell Jane while she was in Appellant's sole care.

While acknowledging that it has been abrogated, Appellant also cites us to the "alternative reasonable hypothesis" construct for analyzing the sufficiency of evidence. He claims it "...remains a useful analytical construct to understand" circumstantial-evidence cases. We disagree. Circumstantial and direct evidence cases are evaluated under the same standard. *Dobbs*, 434 S.W.3d at 170; *Hooper*, 214 S.W.3d at 13. We are prohibited from focusing on "possible alternative explanations, rather than determining whether the jury's inference was reasonable based upon the cumulative force of all the evidence when considered in the light most favorable to the verdict." *Wise v. State*, 364 S.W.3d 900, 902-03 (Tex.Crim.App. 2012), *citing Brooks v. State*,

---

[10]   Robert Pearl, MD, "Medicine is an Art, Not a Science: Medical Myth or Reality" Forbes June 12, 2014; Mens Sana Monogr. "Medicine: Science or Art?" PubMed Health (2006) https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3190445/.

14

323 S.W.3d 893, 895 (Tex.Crim.App. 2010) and *Hooper*, 214 S.W.3d at 13. Even at that, the medical witnesses in varying degrees rejected Appellant's alternative claims that the child might have been injured before he assumed her care, or by some pre-existing medical condition. For all of these reasons, we overrule Appellant's sole point and affirm the judgment of conviction.

July 31, 2017

ANN CRAWFORD McCLURE, Chief Justice

Before McClure, C.J., Rodriguez, and Palafox, JJ.

(Do Not Publish)

15